STATE OF WYOMING on the relation of MART T. CHRISTENSEN, State Treasurer, Plaintiff and Respondent,

vs.

NUGGET COAL COMPANY, a Corporation, Defendant and Appellant.

(No. 2265; Jan. 25, 1944; 144 P. 2d 944)

52

*Louis J. O'Marr,* Atty. Gen., *John J. McIntyre,* Deputy Atty. Gen, and *Arthur Kline,* Asst. Atty. Gen., for plaintiff and respondent.

*G. R. McConnell* and *Ray Dimmitt,* both of Laramie, for defendant and appellant.

## OPINION

BLUME, Justice.

This is an action brought on January 10, 1940, by the State of Wyoming, on behalf of the State Treasurer, against the Nugget Coal Company, a corporation, to recover sums due under the Workmen's Compensation Law. The equitable issues were referred to the Hon. H. R. Christmas, Judge of the Third Judicial District, who found in favor of the plaintiff on these issues. Thereupon, a final judgment in the amount of $3860.52, later reduced to $559.95, was rendered in favor of the plaintiff and against the defendant corporation by the Hon. V. J. Tidball, Judge of the Second District. From that judgment the defendant corporation has appealed to this Court.

From 1935 to July 6, 1939, N. A. Swenson and Frank Yates, Jr., operated a coal mine in this State as a copartnership under the name of Nugget Coal Company. While they were thus operating and on March 30, 1939, one Wayne Johnson, one of its employees, was severely injured. Thereafter and on July 6, 1939, the copartnership organized the corporation herein involved under the name of Nugget Coal Company. At the time of the injury to Wayne Johnson the copartnership had to its credit in the Industrial Accident Fund of this State, in charge of the State Treasurer, the sum of $439.68. By reason of awards made to and on behalf of Wayne Johnson, and paid out of the Industrial Accident Fund, the account of the copartnership was at the time of the trial of this case overdrawn in the sum of $6930.64. The copartnership ceased to pay any money into this fund after the corporation was organized, on the theory that it did not thereafter employ any persons. The corporation sought to open up a new account in the Industrial Accident Fund, paying a smaller percentage of its payroll than would have been necessary to be paid if the account of the partnership had been continued, and the payments made had been credited to it. The Workmen's Compensation Department in the office of the State Treasurer refused to permit the corporation to open up a new account, claiming that the account of the partnership should be continued on the theory that the corporation was but a continuance of the partnership. An agreement was finally entered into under which the Department accepted payments made by the corporation without prejudice to the rights of the State. The amounts paid in accordance with the agreement add up to $1807.99. In this action the State claims that the corporation is but the alter ego of the partnership and as such would be responsible for the amount paid out as compensation to and

for Wayne Johnson. The defendant corporation denies such liability and claims to be a distinct and separate entity, and hence not responsible for any compensation due for accidents while the copartnership existed. The trial court took the view taken by the State, although finding that the evidence failed to disclose that there was any actual intent to defraud the State, and the amount of the judgment herein is the difference between the overdraft of the copartnership and the amount paid by the corporation.

As already stated, the copartnership operated the coal mine in question from 1935 to July 6, 1939. During 1935 Frank Yates, Jr., who had an equal interest in the business with N. A. Swenson, helped in managing the business of the copartnership, but he left for Colorado in 1936, and from that time on N. A. Swenson was the general manager of the business, with an office at Laramie, Wyoming. One L. E. Dupont was the foreman at the mine. When the corporation was organized on July 6, 1939, the interests of the copartnership in its real estate, including the coal mine, was transferred to the corporation. The Bulk Sales Law was not complied with. The motor licenses of the vehicles of the corporation were not transferred until the latter part of 1939 and about the time when new licenses were required to be obtained. The corporation was organized with a capital stock of $200,000, consisting of 20,000 shares of $10 each. No stock was issued to anyone until July 8, 1941, long after the commencement of this action. The defendant corporation claims and its witnesses testified that this was due to the fact that the partnership held certain leases from the Government of the United States; that it did not want to issue stock until the transfer was approved by the Government and that such approval was not obtained until a short time before the

stock was issued. In the meantime, Frank Yates, Jr. sold his interest to N. A. Swenson for the sum of $16,-000, the amount which he had put into the partnership. The testimony of Yates indicates that the sale of his interest took place about September or October, 1939. However, he appears to have been present at a meeting of the corporation held on January 12, 1940, so that the sale took place, perhaps, in September or October, 1940. An appraisement of the property, made about the time of the organization of the corporation, fixed the value of the property of the copartnership at about the sum of $60,000. On June 18, 1941, the corporation issued to N. A. Swenson, the president, general manager, and perhaps treasurer of the corporation, 6500 shares of the stock of the corporation. On the same day and the next day it also issued 150 shares to L. E. Dupont, the foreman of the mine as above mentioned; 10 shares of stock to T. L. Johnson, the secretary of the corporation; 15 shares of stock to one C. J. Abbott, and 1 share of stock to Clare Mundell. A few other shares of stock were issued to some of the employees of the corporation but they were not accepted or were subsequently cancelled by paying these employees the cash for the stock. The directorate of the company appears somewhat confusing in the record before us. Five directors were provided for in the certificate of incorporation but only three are named in the certificate, namely, N. A. Swenson, Frank Yates, Jr., and T. L. Johnson, and these were the only parties present at the first meeting of the board of directors, held on June 8, 1939. Another meeting of the Board was held on September 23, 1940, but the minutes fail to show who was present. A meeting of the stockholders was apparently held on June 8, 1939, but the minutes thereof are not in the record. At a special meeting of the company on January 12, 1940, there were present N. A. Swenson, Frank Yates, Jr.,

Frank Yates, Sr. (father of Frank Yates, Jr.) and L. E. Dupont. The minutes of a special meeting of the stockholders held on September 23, 1940, fail to show who was present. At that meeting there were nominated as the board of directors, N. A. Swenson, T. L. Johnson, L. E. Dupont and one A. C. Abbott, the last of whom does not appear to have had any interest in the corporation. While T. L. Johnson presumably was the secretary of the company, and the minutes show that he was appointed as treasurer, the record fails to show that he had any duties; even the minutes in the record were kept by G. R. McConnell, counsel for the corporation. These minutes were not in Johnson's possession at the trial of this case but were kept at the "general office," which seemingly was the office of N. A. Swenson. The checks of the corporation in the record are signed by N. A. Swenson and one E. R. Jeffreys, the latter of whom testified that he was office manager of Mr. Swenson's interests; these interests of Mr. Swenson apparently being along various lines. Hence it is probable that Mr. Swenson was treasurer as well as president and general manager of the corporation. The office of the corporation is the same as was the office of the copartnership. The debts of the corporation have since the time of its organization been paid in its name. The bank account was continued under the name of Nugget Coal Company, although there is testimony to the effect that the Bank was notified that a corporation had been organized under that name. N. A. Swenson had knowledge of the fact of the injury sustained by Wayne Johnson, as above mentioned, but Frank Yates, Jr., testified that he did not know of the injury until after the organization of the corporation. Both Swenson, Yates and Jeffreys testified that the corporation was organized for the purpose of raising new capital to be put into the coal

mining business and that the liability of the copartnership under the Workmen's Compensation Act, by reason of the injury sustained by Wayne Johnson, was not discussed and was not considered in connection with the organization of the corporation.

It is argued by counsel for the appellant corporation that if the amount claimed by the State from the copartnership were considered an indebtedness, still the Nugget Coal Company, a corporation, is not liable therefor. And he cites among other authorities the case of Durlacher v. Frazer, 8 Wyo. 58, 58 P. 306, 80 Am. St. Rep. 918. But see 18 C. J. S. 544, 545, and a good discussion on the point in Fletcher's Encyclopedia of Corporations, Vol. 8, pp. 402, 410. We do not think that it is necessary to determin whether the rule in Durlacher v. Frazer, supra, is correct or not. That case involved a private debt. The indebtedness in this case is in the nature of a tax. Unemployment Compensation Commission v. Renner (Wyo.) 143 P. 2d 181. Compensation awards, too, differ from the ordinary debts of a corporation in a number of particulars; they are an obligation imposed by law and arise out of the status of relationship existing between employer and employee. Bowen v. Hockley, 71 Fed. 2d 781. And this case involves a fixed policy of the State, and the intent of the legislature that each employer should take care, as hereafter shown, of the compensation due to his own employees. The basis for the tax existed long before the defendant corporation herein was organized, namely, on March 30, 1939, when Wayne Johnson was severely injured in an accident while employed in the coal mine operated at that time by the copartnership, and the question herein is as to whether or not the payment of that tax can be evaded by the copartnership organizing the Nugget Coal Company into a corporation.

Counsel for appellant further argues that the partnership in fact owes nothing to the state since it ceased to operate the coal mine when the corporation was organized; that under the laws of this State, the Workmen's Compensation Department, through the Industrial Accident Fund of the State, rather than the individual employer, was meant to be the insurer of the compensation paid to workmen; that the payments made by the employers in this State are in the nature of premiums paid to an insurance company; that the rates have been fixed so as to take care of all payments due; that the employers are not liable except for the premiums so fixed by the State; that the Workmen's Compensation Department is situated no differently than an insurance company, which would be liable for the compensation to be paid to workmen who are killed or injured no matter how much larger that compensation may be than the amount of the premiums paid. Special attention is called to the provisions of Section 124-135, Rev. St. 1931, stating that "no part of any moneys so paid in by any employer shall ever be refunded to him, either during the time when he continued in business as such employer or after he ceases such business." That provision, of course, was made so that there might be a reserve fund in the Industrial Accident Fund to safeguard its depletion and to have on hand at all times sufficient money to pay the compensations which are to be made out of the fund, and that statutory provision has not, it would seem, any particular bearing in this case. And a consideration of the laws of this State would seem to shatter the entire foundation of counsel's theory.

The State has created an Industrial Accident Fund out of which compensation for the injuries to workmen may be paid. Section 124-116 Rev. St. 1931. The source of that fund consists of payments made by em-

ployers engaged in extra hazardous occupations. Sec. 124-117. By the provisions of that section, as amended by Chaper 128, S. L. of 1937, each member engaged in the business of coal mining, makes monthly payments into the fund of an amount equal to 2% of his payroll. A separate account is kept for each employer contributing to the fund. Special provision is made if the fund is overdrawn and it is provided that "any employer whose account is overdrawn may in addition to the regular, required monthly payments above provided for pay any additional sum up to the full amount of the overdraft of such employer, and such employer shall be entitled to a discount of 5% of the amount of any such additional payment, and the Treasurer shall accept any such additional payment and in crediting the same to the account of such employer shall give such employer the benefit of such 5% discount." That would seem to indicate the thought of the legislature that each employer shall pay the compensation due on account of injuries to workmen in his employ, and, as noted, a special inducement is given to the employer to promptly pay any overdraft by giving him the benefit of a discount of 5%. The employer, however, may elect to pay such overdraft in installments, but that election is evidently given by the legislature for the purpose of lightening the burden of the several employers. It is provided that if the overdraft is 1% or less of the annual payroll 4% shall be paid instead of 2%; if the overdraft is greater than 1% and not more than 2% of the annual payroll 5% instead of 2% shall be paid; if the overdraft is greater than 2% and not more than 3% of the annual payroll 6% instead of 2% shall be paid. If the overdraft exceeds 4% of the annual payroll, then 8% instead of 2% shall be paid. And it is further provided in the Section that "for the purpose of encouraging care on the part of employers and thus decreasing accidents to em-

ployees and to the end that each employer shall compensate all injuries to the workmen of such employer and not those of other employers, the State Treasurer shall keep a separate account for each employer so contributing to that fund and shall charge against the account of each employer all warrants paid from the Industrial Accident Fund." This provision, it would seem, puts beyond any question the fact that the legislature intended that each employer shall pay, as nearly as possible, the amount paid out of the Industrial Accident Fund as compensation to or on behalf of his own employees who may be injured or killed, and any method devised to evade such payment is clearly one which would take advantage of the benefit extended to employers of the State, as above mentioned, and to defeat the intention of the legislature.

We find here, accordingly, a fixed policy of the State. It is held in Hartford Accident and Indemnity Company v. Industrial Accident Commission, 216 Cal. 40, 13 P. 2d 699, that the State may require a bond from an employer to insure payment of compensation due on account of accidents to his employees and such bond is in fact required under the provisions of Section 124-117 Rev. St. 1931 (amended by Chapter 128 S. L. 1937) from non-resident employers of extra hazardous occupations. It is also held that the State may make the payments due from employers a lien upon their property. 71 C. J. 906. Instead of resorting to these methods this State has seen fit to extend to resident employers the privilege to pay any overdraft in a lump sum or in monthly installments with the expectation that all that may be due will be paid in due course of time. Of course, this court does not have the privilege to open up an easy method by which the payments due may be evaded. An easy method would be if an individual, or a partnership, were permitted

to escape liability merely by organizing a corporation, or if a corporation were permitted to escape liability merely by dissolving and continuing the business as a partnership. On the contrary, we conceive it to be the duty of this court if we can do so under the rules of law, to thwart any method or scheme by which the intention of the legislature may be defeated and the payments expected from employers be evaded. Otherwise the whole structure of our Workmen's Compensation Law might be wrecked. We think that the rules of law do not require or permit such wreckage. Whether a successor in interest of a person, partnership or corporation, continuing the same business, in the same place, should in all cases be held responsible for the obligations of compensation against the seller incurred and existing at the date of the sale need not be decided (See Section 124-135 Rev. St. 1931), since this case may be decided without going to that length.

It is, of course, a fundamental rule of law that ordinarily a corporation is a separate entity distinct from that of the individuals composing it. 18 C. J. S. 368. And a person or persons may incorporate for the purpose of escaping personal liability for the debts of a corporation. Newark Fire Ins. Co. v. Brill, 7 N. Y. S. 2d 773; National Hotel Co. v. Motley (Tex. Civil App.) 123 SW 2d 461; Buckner v. Dillard, 184 Okla. 586, 89 P. 2d 326. That is true as to future liabilities. A different rule may apply as to liabilities incurred by individuals prior to the organization of the corporation by them. And in tax cases and some other cases even future individual liabilities may at times not be able to be avoided. See Higgins v. Smith, 308 U. S. 473; 84 L. Ed. 406; 60 Sup. Ct. 355; Commissioner Internal Revenue, 124 Fed. 437. Experience has shown that to regard a corporation as a separate entity in all cases would at times lead to an injustice and contravene the

policy of the State. Hence courts, since the property of the corporation belongs in equity to the stockholders, have held in almost numberless cases that a corporation should at times, and for the purpose of the case before them, be held to be but an association of individuals, or the alter ego, or agent, adjunct or instrumentality of the individuals composing it, or vice versa. 1 Fletcher Cyc. Corporations, Section 41-48, 14 C. J. 59 et seq., 18 C. J. S. 376 et seq., Caldwell v. Roach, 44 Wyo. 319, 12 P. 2d 376, and cases cited. It is said in 1 Fletcher, supra, p. 136, "that when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." On p. 170 of the same authority, it is said: "Where the corporate form of organization is adopted or a corporate entity is asserted in an endeavor to evade a statute or to modify its intent, courts will disregard the corporation or its entity and look at the substance and reality of the matter." In the case of Lakeshore drive Building Corp. v. Hughes, 369 Ill. 476, 17 NE 2d 38, it is held that courts in order to prevent corporate evasion of statutory or constitutional duties will view with care the corporate set up whereby the corporation appears to avoid such obligation. And in William C. Atwater & Co. v. Fall River Pocahontas C. Co., 119 W. Va. 549, 195 SE 99, 105, the court stated that "generally, without exception, the corporate veil will be torn away whenever the occasion makes it necessary to prevent fraud or a wrong." The Supreme Court of Minnesota in Clarke v. Bennett, 204 Minn. 574, 284 NW 876, rejected as fundamentally unsound and obsolete the thesis that a corporation can be regarded for any purpose as a mere fiction of law. And see comment on that case in 24 Minn. L. Review 107-109, and see further Columbia L. Review 128-143, 33 Harvard L. Review 878-880. But the court in the

Minnesota case just cited treated the corporation as but another self of the trustee involved in that case. In some of the cases the courts, considering a corporation as an alter ego or instrumentality of an individual or partnership, have held the individual or partnership liable. That has been true in a number of cases in which a corporation was organized for the purpose of holding stock in a bank so as to evade statutory liability, in case the bank should fail. Nettles v. Rhett, 94 Fed. 2d 42, and cases cited. The evasion of the statutory duty under the Workmen's Compensation Law is not unrelated to the evasion in the foregoing cases. And an individual or partnership rather than the corporation organized by him, or it, has been held liable in cases involving payments due for compensation under the Workmen's Compensation Law. Hawkins v. Bryan, 128 Okla. 27, 261 P. 167; Dixie Coal Mining & Mfg. Co. v. Williams, 221 Ala. 331, 128 SO 799. Whipple v. Industrial Commission, 59 Ariz. 1, 121 P. 2d 876. In the last of these cases the court said:

"We think under the evidence in the present case the commission was fully authorized to find that the corporation herein was the alter ego of a partnership composed of Whipple and Brady, organized for the purpose of evading any personal liability on their part under the compensation act, and was fully justified in holding them individually responsible as the employers of petitioner in the present case."

If a corporation is the alter ego of a partnership, and the latter may on that account be held liable, there is no reason why in such a case the corporation may not be held liable. And the authorities so hold. Thus, it is said in 1 Fletcher, supra, p. 172, that, "courts may either prevent law violations or evasions by disregarding a corporation used to that end, or may do so by regarding it and decreeing against it as the responsible party." In Grotheer v. Meyer Rosenberg, 11 Cal. App.

2d 268, 53 P. 2d 996, the court, citing a number of cases said that "it is well settled that inasmuch as the separate personality or capacity of a corporation is but a statutory privilege, it must not be utilized for fraudulent purposes, such as a cloak or disguise for the evasion of contracts or other obligations; and that where it appears that it is being used merely as an instrumentality through which an individual who is the owner of its capital stock transacts his business, both law and equity will hold the corporation liable for the obligations of its owner." In Mass. B. & Ins. Co. v. Master Laboratories, (Nebr.) 10 NW 2d 501, the court quotes with approval from Anderson, Limitations of the Corporate Entity, Sec. 247, as follows:

" 'It is now so well established that it has become almost aphoristic that, upon a proper showing that a corporation is but an instrumentality through which its owner or substantial owners for convenience transacts or transact his or their business, by the great weight of authority, both equity and law will look through the form to its substance and will hold such corporation bound as the owner of the corporation might be bound or conversely hold the owner bound by acts which bind his corporation. And so, where an individual owns all of the stock of a corporation or substantially so, and that the corporation is in truth and in fact, but the juristic double of its owner and where fraud or injustice will likely operate to the injury of third persons, this situation suffices to dissipate the separate factional identity of the corporation and the law will have no compunction in holding the corporation liable for the acts of its owners or vice versa. And this rule is the same though the stock of the corporation is owned by two or more who act in conjunction with the corporate organization."

Among other cases in which the corporation has been held liable under similar circumstances are Keating v. Hammerstein, 209 N. Y. S. 769, Heard v. Sand and Gravel Co., 9 La. App. 568, 121 SO 642. Actual in-

tent to defraud is not necessary. It is sufficient if the refusal to recognize the fact of the identity of the corporate existence with that of the individual would bring about an inequitable result. 18 C. J. S. 377, and cases cited. 1 Fletcher, supra, 167, 172; Wenban Estate, Inc. v. Hewlett, 193 Cal. 675; 227 P. 723; In re Ostego Waxed Paper Co., 14 Fed. Supp. 15. On the other hand the mere fact that one or more persons own all of the stock of a corporation is not sufficient to treat the corporation as an alter ego of the person or persons. 1 Fletcher, supra, p. 178. It has been stated that:

"Before the acts and obligations of a corporation can be legally recognized as those of a particular person, and vice versa, the following combination of circumstances must be made to appear: First, that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice."

Minifie v. Rowley, 187 Cal. 481, 202 P. 673; Constitutional Securities and Investment Co. v. Rawson, 208 Cal. 228, 280 P. 954; Shea v. Leonis, 29 Cal. App. 2d 184, 85 P. 2d 491 Fletcher, Supra, 141, 142. And in 18 C. J. S. 378, it is said that: "It must appear not only that the corporation is controlled and influenced by one or a few persons but, in addition, it is necessary to demonstrate that the corporate cloak is utilized as a subterfuge to defeat public conveniences, to justify wrong, or to perpetrate fraud."

Unity of interest should exist so that no injustice may be done, for the corporate entity will not be disregarded, when to do so would promote an injustice and contravene public policy. 18 C. J. S. 379. And

control of the corporation by the individual, or individuals, must appear. In Philadelphia Storage Battery Co. v. Radio Corporation, 22 Delaware Chancery 211, 321, 149 Atl. 414, 430, 6 Atl. 2d 329, the court stated that "control to a degree that shows the presence of what is tantamount to compulsion, either actual or potential, is the first essential for the arising of the instrumentality rule * * *. It is the exercise in fact of the potential power of control which the parent has over the subsidiary and the practical operation of its consequences, which supply the test for determining whether the instrumentality rule will be applied so as to make the parent responsible for the acts of the subsidiary." The authorities do not seem to have discussed the point of time when the unity of interest and control must exist in order that the rules above mentioned may be applied. Since no injustice should be done in such case it is probable that the circumstances of the purchase of stock and the time thereof should be considered. In the case at bar, the partners owned all the interest in the corporation at the time when the corporation was organized and until after the demands of the State herein had become known to them so that for sometime in any event the unity of interest and the control of the corporation was complete in them. If Yates sold his interest to N. A. Swenson in September or October, 1940, the partners owned all the interest in the corporation and had complete control thereof after the action herein was brought. In any event Swenson bought the interest of Yates after he had full knowledge of the demands of the State herein. No other person acquired any interest in the corporation until July 8, 1941, two years after the corporation was organized. Assuming, however, that the rights acquired on and after the last mentioned date by other parties should ordinarily be taken into consideration in a case like that before us we do not think that they are a

controlling factor herein for we do not understand from the authorities that unity of interest and ownership and the requisite amount of control necessarily requires ownership of 100% of the stock of the corporation by the person or persons controlling the corporation. In Pohlman Investment Co. v. Virginia City Gold Mining Co., 184 Wash. 273, 51 P. 2d 363, it was held that an agreement by 99% of the holders of stock was binding on the corporation. In Heard v. Sand and Gravel Co., supra, an agreement by the president of a corporation who owned $11,900 of the stock, while outsiders owned $1050 of the stock, was held binding on the corporation. In that case the assets of the corporation when it was organized was property conveyed to it by the president, just as in the case at bar, the only assets which the appellant corporation had at the time when it was organized was the property conveyed to it by the partnership. In Roberts v. Hilton Land Co., 45 Wash. 464, 88 P. 946, the acts of the president of a corporation who owned 98% of the stock was held binding on the corporation. In Witherspoon Oil Co. v. State (Tex. Civil App.) 156 SW 2d 579, a corporation and majority stockholder were treated as a single employing unit for the purpose of the unemployment compensation tax. In Fish v. East, 114 Fed. 2d 177, 191, the court set forth in detail the circumstances under which one corporation may be held to be the instrumentality of another and states in part that "the determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree. The following determinative circumstances are recognized: (1) The parent corporation owns all or majority of the capital stock of the subsidiary." As already seen, Anderson, Limitations of the Corporate Entity, holds that the rule may be applied if an individual owns all the stock of a corporation or substantially so. That authority was apparently approved by the

Supreme Court of Nebraska as above mentioned. The same rule was recognized in Raymond-Eldredge Co. v. Security Realty Inv. Co., 91 Fed. 2d 168; Watson v. Commonwealth Ins. Co., 8 Cal. 2d 61, 63 P. 2d 295; McKay v. Motor Transit Co., 125 Pa. Superior Ct. 217, 189 Atl. 772; Hermitage Land and Timber Co., 263 Ky. 651, 93 SW 2d 1; Smith v. Moore, 199 Fed 689. In Sunset Farms, Inc. v. Superior Court of Imperial County, 9 Cal. App. 2d 389, 50 P. 2d 106, 113, the court stated, "We do not understand that by 'Unity of Interest and Ownership' it is meant that every share of stock in the corporation must be owned by the individual who is masquerading under the legal fiction of separate corporate identity in order to justify a court of equity in stripping away the mask particularly when it appears that the mask is being used as a convenient instrumentality for the perpetration of fraud."

Applying the foregoing rules of law to the case at bar, we think we are constrained to sustain the trial court in holding that the appellant corporation in this case should be held liable for the tax debt incurred by the partnership which organized the corporation. If we should hold otherwise the intent of the statute and the policy of State to compel each employer to pay the amount due for compensation to his employees would be defeated and an injustice would result not alone to the State but to all other employers engaged in this State in extra hazardous occupations as well. In fact, since Swenson appears to be an employer in a number of other lines, our holding in his favor in this case would probably in the long run turn out to be to his injury. As heretofore stated, at the time of the organization of the appellant corporation all the interest in the corporation was owned by the partners. That remained true until Yates sold out his interest to Swen-

son. That latter, at that time, had notice of the pendency of this suit, or at least of the claim of the State herein, so that he doubtless bought the interest of Yates with the State's claim in mind. Thereafter and until July 8, 1941, two years after the organization of the corporation, Swenson owned all of the interest in the corporation. On the last mentioned date, which was long after the suit herein was instituted, a few shares of stock were sold to outsiders. 150 shares of stock were sold to L. E. Dupont. But he was foreman in the mine and he knew all about the injury sustained by Wayne Johnson. 10 shares of stock were issued to T. L. Johnson, Secretary of the corporation, who should have known about the demands of the State in this case, since the minutes of a meeting of the corporation of date January 12, 1940, recited that demand. That leaves only one share of stock issued to Clare Mundell and 15 shares issued to C. J. Abbott. The record does not show whether these parties had knowledge of the injury to Wayne Johnson or of the demand of the State herein. C. J. Abbott is probably a relative of A. C. Abbott, who appears as a director of the corporation, and who knew or should have known of the demands of the State herein. In any event the 16 shares of stock of the two stockholders last mentioned is an insignificant part of the total of 6676 shares of stock outstanding, and should not stand in the way of dealing out justice herein, particularly in view of the fact that when that stock was acquired the suit in this case had been pending for a year and a half. N. A. Swenson, the holder of 6500 shares of stock, has been in complete control of the corporation since July 8, 1941, as he was previous to that time, both before and after the organization of the appellant corporation. He is, and since its organization, has been the president and general manager of the corporation, and probably treasurer thereof. He and his office man-

ager control all the funds of the corporation. He was general manager of the business of the copartners, commencing with about 1936. The office of the corporation is the same as was that of the co-partnership. The property and the business and the name, too, are' the same. The bulk Sales Law was not complied with so as to protect the corporation against liability of the copartnership. The motor licenses of the partnership were not transferred until close to the end of the year 1939 when it became necessary to obtain new licenses. It has been held that "the conditions under which the corporate entity may be disregarded, or the corporation be regarded as the alter ego of the stockholders, necessarily vary according to the circumstances in each case, inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court." Stark v. Coker, 20 Cal. 2d 839, 129 P. 2d 390; H A S Loan Service, Inc. v .McColgan, 21 Cal. 2d 518, 133 P. 2d 391. Taking all the facts in this case into consideratoin, we know of no sound reason for not sustaining the holding of the trial court, that the corporation is but the alter ego of the copartnership, and the judgment in the court below is accordingly affirmed.

*Affirmed.*

KIMBALL, C. J. and RINER, J., concur.