**Shirley M. YOST, Administratrix of the Estate of Robert B. Yost, Appellant (Defendant),**

**Yost Brothers Company, (Defendant),**

v.

**HARPEL OIL COMPANY, Appellee (Plaintiff).**

No. 83–88.

Supreme Court of Wyoming.

Dec. 2, 1983.

Rehearing Denied Dec. 22, 1983.

J. Kent Rutledge of Lathrop & Uchner, P.C., Cheyenne, for appellant.

James E. Fitzgerald, Cheyenne, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROSE, Justice.

This is a collection suit filed by plaintiff-appellee, a supplier of gasoline and other related products, against its retailer, appellant Yost Brothers Company, a Wyoming corporation, and appellant Shirley M. Yost as the administratrix of the estate of the principal stockholder Robert B. Yost. Recovery against the corporation was sought on the theory of goods having been sold and delivered. Recovery against the estate of the deceased shareholder was sought on the theory that the shareholder had guaranteed payment of the indebtedness, and on the theory that the corporation was a sham.

The court found that the defendants in the trial court (one of whom is an appellant here) were indebted to the plaintiff (appellee here) in the sum of $207,105.22 for gasoline and other supplies which had been received but for which payment had not been made. Judgment was entered for this sum and costs, and Shirley M. Yost appeals.

We will affirm.

Plaintiff-appellee, Harpel Oil Company, hereinafter referred to as Harpel Oil, is a Colorado corporation engaged in the business of supplying gasoline and related products to various retail dealers. Defendant-appellant, Shirley M. Yost, is the widow and administratrix of the estate of Robert B. Yost, who died December 4, 1981. Robert Yost was one of three incorporators and the president and chief executive officer of defendant Yost Brothers Company, a Wyoming corporation which was organized and incorporated under the laws of the state of Wyoming in 1960. From 1964 up until the time of his death, Robert Yost owned two-thirds of the stock in the corporation and made most if not all of the management decisions for the company. The remaining one-third of the outstanding stock was held in escrow subject to a purchase agreement between incorporator Peter Cheladyn and Yost Brothers Company.

Yost Brothers Company was organized for the purpose of operating a combination restaurant, grocery store, and gasoline station and Harpel Oil began supplying gasoline to the Company immediately after Yost Brothers Company had commenced doing business in the latter part of 1960. It was the practice for Harpel to invoice Yost Brothers for gasoline as it was delivered, and the outstanding invoices were carried on an open account by Harpel Oil. This relationship continued until just prior to the trial of this case in August of 1982.

Yost Brothers did not stay current with the invoices from the very beginning of the business relationship, and by 1964 the past-due balance on the open account was $41,175.00. On July 28, 1964, Yost Brothers Company and Harpel Oil entered into a financing arrangement which was designed to reduce Yost's land payments to a third party and to provide for monthly payments to discharge the $41,175.00 debt with Harpel Oil. This arrangement included the conveyance of the real property of Yost Brothers Company to Harpel Oil, through a contract for deed with Yost's vendor which contract also provided that Yost Brothers Company would repurchase the property from Harpel Oil for $60,000.00. This agreement further contemplated a payment schedule, an interest provision, a promise on the part of the Yost Company that it would purchase all of its fuels from Harpel and would pay a one cent per gallon surcharge to be credited to the open account in the amount of $41,175.00. Payment in full of this last-mentioned amount was made a condition precedent to reconveyance of the land to the Yost Company under the contract for deed.

The contract for deed was not signed or executed by Yost Brothers Company or anyone in behalf of the Company—nor by Robert B. Yost, individually. The corporate records seem to acknowledge a purchase arrangement concerning the property, but the books also indicate that the instrument was meant to contemplate some sort of a mortgage arrangement. Harpel testified that when the contract for deed was not honored, the parties entered into a rental agreement. However, contrary to the testimony of Mr. Harpel, the plaintiff's position was that the contract for deed continued to exist and sought judgment under the contract for $110,270.25.[1] The trial court made no award for damages upon this claim of the appellee.

The stockholders of Yost Brothers Company entered into still another agreement which

> "individually guaranteed the payment of all amounts due Harpel Oil by Yost Brothers Company, and thereby assumed personal responsibility and liability for all such indebtedness."

This agreement, which contained the individual guarantee of the shareholders of Yost Brothers Company, was signed in behalf of Yost Brothers Company by Robert B. Yost and Bonnie E. Yost. Bonnie E. Yost does not appear on the business records as a shareholder and Mr. Cheladyn did not sign the agreement. When the agreement was executed, Robert B. Yost held two-thirds of the shares of Yost Brothers Company. The agreement recites that Bonnie E. Yost is a shareholder of Yost Brothers, Inc.

All parties acknowledge that by July, 1973 the sum of $41,175.00, representing the original indebtedness on the open account of 1964, had been paid in full by Yost Brothers Company. However, the record reveals that, during the period from July 28, 1964 through May 31, 1982 Harpel continued to supply Yost Brothers Company on an open account until, as of June 30, 1982, the unpaid balance was in the amount of $207,105.22.

The following is a summary of the evidence upon which the trial court relied to

---

1. In its Findings of Fact and Conclusions of Law, the trial court found that Harpel Oil Company terminated the sales agreement for the land and thereafter treated the land-related payments as rent. The trial court further found that the amount of rent due and owing was impossible to calculate and so denied the plaintiffs' claim for this item of damage. The appellee does not appeal from this ruling and so the issue is not before us for review.

hold that the corporate veil had been pierced.

After 1962, Robert B. Yost was the managing officer of Yost Brothers Company, and this corporation was the only vehicle by which Robert Yost conducted business and the company was, at all times, closely identified with him personally. Robert Yost funneled corporate money through his personal account to finance a drug paraphernalia business and utilized corporate funds to invest in the stock market under his personal account. There were few corporate meetings. Annual-meeting minutes were prepared by the corporation attorney and sent to Robert Yost for signature. The minutes were inaccurate and reflected such things as listing one A.C. Weber as president, although he had long since been deceased. The minutes show Peter Cheladyn as present and participating as a stockholder in meetings after he had sold his stock. The minutes show people attending meetings together when the evidence showed that these persons either did not attend meetings together or did not attend meetings at all. An employee who worked for Yost Brothers Company since 1968 and who was in a position to observe testified that she had never seen the stockholders in a corporate meeting.

With reference to Robert B. Yost's personal finances, the evidence disclosed that Yost and his wife had indicated very meager personal combined income on their tax returns, yet their bank deposits were greatly in excess of any explained income. During this period of time, the funds of the corporation were minimal or nonexistent and creditors such as the appellee remained unsatisfied. In these years, Robert B. Yost acquired a coin collection valued at in excess of $100,000.00, and those who testified were unable to furnish any satisfactory explanation as to how the funds for this acquisition were obtained.

The record discloses that moneys were used for Yost's drug paraphernalia business, and Shirley Yost conducted a music business as a sole proprietorship through the joint checking account with Yost Brothers Company, thus commingling personal and corporate assets. In sum, the personal funds of Shirley and Robert Yost and the corporate funds of Yost Brothers Company were commingled at will until—to paraphrase the trial court—it became impossible to determine how the corporate funds and Robert B. Yost's personal funds were handled or to trace the origin and disposition of these moneys.

The trial court found and held that the funds of the Company had been commingled with those of Robert and Shirley Yost; that Robert Yost had given his personal assurance and guarantee on numerous and continuing occasions that he would be personally responsible for the debt to Harpel Oil; and that the plaintiff should have judgment in the sum of $207,155.22 against the estate of Robert B. Yost for the products received by Yost Brothers Company for which payment was not made and for costs.

### The Trial Court's Decision

Based upon the findings of fact, conclusions of law and judgments of record, we perceive the trial court's decision to be that the appellee has judgment against the appellant for $207,155.22 for moneys owed on an open account by Yost Brothers Company to Harpel Oil Company, on two theories:

1. Robert B. Yost, deceased, had guaranteed the account and thus it became his personal debt and, upon his death, the debt of his estate.

2. Whether or not there was a valid guarantee, the debt was in fact the debt of Robert B. Yost and, upon his death, the debt of his estate, for the reason that his corporation was not the actual debtor because of the way Mr. Yost conducted his personal and the corporation's business. The court found that these business practices were carried on in such manner so as to permit the plaintiff-appellee to pierce the corporate veil, the result of which holding is that the purported debts of the corporation were in fact the debts of Robert B. Yost and, at his death, the debt of his estate.

The appellants raise the following issues for our consideration:

1. Is there sufficient evidence to support a judgment on the theory that the corporate veil should be pierced?

2. Is plaintiff-appellee entitled to recover on the theory of a personal guarantee?

3. If so, is there sufficient evidence to sustain the finding of a personal guarantee?

4. Can plaintiff-appellee recover an amount greater than specified in its claim against the estate?

In response to Issue No. 1 above, we find that there is sufficient evidence to support the judgment on the theory that the corporate veil should be pierced. We will therefore not address designated Issue No. 2 and Issue No. 3 above. With respect to Issue No. 4, we will hold that the claim with the estate was properly amended and was before the civil and the probate court in good form.

### Issue No. 1

Is there sufficient evidence to support a judgment on the theory that the corporate veil should be pierced?

We find that there is.

■■■ This issue raises a factual question, i.e., sufficiency of the evidence. We have said that where the separate-entity doctrine is relied upon, each case must be governed by its own facts, *Opal Mercantile v. Tamblyn,* Wyo., 616 P.2d 776 (1980). Fact questions must be decided by the trier of fact, *Aetna Casualty and Surety Company v. Stover,* 327 F.2d 288 (8th Cir.1964); *H.A.S. Loan Service, Inc. v. McColgan,* 21 Cal.2d 518, 133 P.2d 391, 145 A.L.R. 349 (1943); *Opal Mercantile v. Tamblyn,* supra. We will not substitute our judgment for that of the trier of fact, findings of fact will be presumed to be correct and we will set them aside on appeal only where such findings are "clearly erroneous or contrary to the great weight of evidence," *Kvenild v. Taylor,* Wyo., 594 P.2d 972, 976 (1979); see also, *Plains Tire and Battery Company v. Plains A to Z Tire Co., Inc.,* Wyo., 622 P.2d

917, 920 (1981); *Shores v. Lindsey,* Wyo., 591 P.2d 895, 899 (1979). Additionally, in examining a fact issue,

" 'We must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it.' " *Peters Grazing Association v. Legerski,* Wyo., 544 P.2d 449, 455 (1975), reh. denied, 546 P.2d 189 (1976), quoting from *Stock v. Roebling,* Wyo., 459 P.2d 780, 784 (1969).

See also *Overcast v. Baldwin,* Wyo., 544 P.2d 464, 465 (1976).

In *AMFAC Mechanical Supply Co. v. Federer,* Wyo., 645 P.2d 73 (1982), this court discussed various factors which are relevant to a consideration of the corporate-entity issue and we there reviewed the concepts set out in *Opal Mercantile v. Tamblyn,* where we said:

"Ordinarily, a corporation is a separate entity distinct from that of individuals comprising it. *State ex rel. Christensen v. Nugget Coal Co.,* 60 Wyo. 51, 144 P.2d 944 (1944); *Durlacher v. Frazer,* 8 Wyo. 58, 55 P. 306 (1898). This is true although all or a majority of the stock is owned by a single individual. *Durlacher v. Frazer,* supra; *W.D. Miller Lumber Corporation v. Miller,* 225 Or. 427, 357 P.2d 503 (1960). However, in an appropriate case and in furtherance of public policy or the ends of justice, the doctrine will be disregarded. *Peters Grazing Association v. Legerski,* supra; *State ex rel. Christensen v. Nugget Coal Co.,* supra; *Caldwell v. Roach,* 44 Wyo. 319, 12 P.2d 376 (1932)." 616 P.2d at 778.

In *AMFAC Mechanical Supply Co.* we then sounded this warning:

"For a corporation to be accorded treatment as a separate entity, it must exist and function as such and not be the alter ego of the person owning and controlling it and cannot be used or ignored just to fit the convenience of the individual. *Co-*

hen v. Williams, 294 Ala. 417, 318 So.2d 279 (1975)." 645 P.2d at 79.

We looked with approval upon certain aspects of the opinion contained in Arnold v. Browne, 27 Cal.App.3d 386, 103 Cal.Rptr. 775 (1972), overruled on other grounds, 25 Cal.3d 124, 158 Cal.Rptr. 1, 599 P.2d 83 (1979) when we quoted from that opinion as follows:

" * * * ' "Before a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." ' [Citations.]" 103 Cal.Rptr. at 781, quoted in AMFAC Mechanical Supply Co. v. Federer, supra, 645 P.2d at 77.

We then took note of the factors to be considered in deciding whether a corporation is a separate entity when we again quoted Arnold v. Browne, 103 Cal.Rptr. at 781–782, with approval, as follows:

" 'Among the possible factors pertinent to the trial court's determination are: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citation].' " 645 P.2d at 77–78.

Given the factors which will support the disregard of the corporate entity, we look to the findings of the trial court.

### Diversion of Assets from the Corporation to the Detriment of Creditors

With respect to the diversion of assets, the trial judge found:

"Robert B. Yost had no income producing business other than Yost Brothers Company. He never withdrew more than $130 per week in salary from the corporation. In 1973, Robert and Shirley Yost's combined income was $12,043.87, yet Robert Yost made deposits into his personal account totaling $16,147.45. * * * In 1974 Robert and Shirley Yost's combined income was $12,468.80, yet Robert Yost made deposits into his personal account of $30,062.58, of which $18,780 was in cash.

\* \* \* In 1977, Robert and Shirley Yost's combined income was $10,368.80, yet Robert Yost deposited $23,930 into his personal checking account. \* \* \*

\*    \*    \*    \*    \*    \*

"\* \* \* It would appear to the Court that there is a great likelihood in view of the testimony of various witnesses as to transactions in the stock market, in coins and in behalf of third persons without substantiating records that there was an unauthorized diversion of corporate funds or assets to other than corporate uses."

The court found detriment to creditors where the judge said:

"In 1964 the defendant had fallen behind in payments for gasoline products and was indebted to the plaintiff in the amount of $41,175. Further, the defendant, Yost Brothers Company, had failed to make payments under a purchase agreement for the business real estate."

*Commingling Funds and Other Assets*

The trial judge found:

"Robert B. Yost funneled corporate money through his personal account to finance a drug paraphernalia shop for the business. \* \* \*

\*    \*    \*    \*    \*    \*

"The wife of Robert B. Yost, Shirley Yost, conducted a music business as a sole proprietorship through the joint checking account with Yost Brothers Company, commingling personal and corporate assets. Yost Brothers Company carried the music business equipment as a corporate asset since 1976 and declared music income since 1976. \* \* \*

"The consistent use of cash in acquiring business inventory, making purchases for the business, making cash deposits to the personal checking account of Robert B. Yost, making purchases for the personal use of Robert B. Yost and for Shirley Yost make it difficult if not impossible to accurately determine how corporate funds were handled or to trace the origin of said funds. It appears that expenses for food, entertainment, fuel, and automobile expenses were not paid from the personal accounts of Robert and Shirley Yost."

*Representation With Respect to Personal Liability for the Debts of the Corporation*

The trial judge found:

"\* \* \* On July 28, 1964, the defendant and the plaintiff entered into certain agreements by which the plaintiff agreed to purchase the business property from the defendants' vendor and resell the business property to Yost Brothers Company for the sum of $60,000 under a contract for deed. Another agreement provided that all of the stockholders of Yost Brothers Company, including Robert B. Yost 'individually guaranteed the payment of all amounts due Harpels by Yost Brothers and hereby assume personal responsibility and liability for all such indebtedness.'

\*    \*    \*    \*    \*    \*

"It should be noted that the agreement containing the individual guarantee of the shareholders of Yost Brothers Company has been signed in behalf of the defendant Robert B. Yost, by Robert B. Yost personally and by Bonnie E. Yost. The record does not indicate what interest as a shareholder was held by Bonnie E. Yost and it further appears that the one-third owner or shareholder, Mr. Cheladyn did not sign the agreement. At the time that the agreement was signed, Robert B. Yost apparently held two-thirds of the shares of Yost Brothers Company. The agreement recites that Bonnie E. Yost is a shareholder of Yost Brothers, Inc.

\*    \*    \*    \*    \*    \*

"Robert B. Yost continuously extended to plaintiff his personal guarantee for the corporation's debts after John Harpel became personally involved in the supervision of credit with Robert B. Yost."

### The Use of a Corporation as a Mere Shell for the Business of the Corporation

With respect to this factor, the court found:

"Robert B. Yost, Peter Cheladyn, and Jack Yost were the incorporators of Yost Brothers Company. Cheladyn furnished the capital and the Yost Brothers were to operate the business. Jack Yost left the business in 1962. Mr. Cheladyn sold his shares to the company in 1975, but was never paid. Throughout the corporate history, Robert B. Yost was the president, operating executive of the corporation, and member of the board of directors of the corporation. In 1964 until his death, he held two-thirds of the stock of the corporation, and the remaining one-third was held in escrow after 1975, subject to the purchase agreement of Mr. Cheladyn's shares by Yost Brothers Company.

\* \* \* \* \* \*

"That after 1962, Robert B. Yost was the sole managing officer of Yost Brothers Company. The corporation is revealed by the evidence to be the only vehicle by which Robert B. Yost conducted business and it was closely identified with him, personally."

### Identical Equitable Ownership in the Personal and Corporation Entities

As indicated above, the trial court found that Shirley Yost declared income from her personal music business as sole proprietor and deducted business expenses from her personal income tax, yet the corporation carried her equipment as assets and depreciated them.

### Failure to Observe the Legal Formalities of the Corporation

The trial judge found:

"There were few formal meetings of the corporation, Yost Brothers Company, conducted. Annual meetings were prepared by the corporate attorney, Richard F. Pickett, and sent to Robert Yost for his signature. Those corporate meetings frequently list A.C. Weber as president and

participating, although he died in 1970. \* \* \* The minutes list Peter Cheladyn as present and participating after 1975, although he had sold his stock and left the business that same year. \* \* \* The meetings showed Gene Weber and Peter Cheladyn together at shareholder and director meetings although the testimony is that Gene Weber did not attend any company meetings and did not attend meetings with Mr. Cheladyn. Sharon Petzoldt, who worked for the defendant Yost Brothers Company since 1968, had never seen a corporate meeting."

■ Given the rules which govern the parameters of our inquiry into the fact-finding aspects of the trial process, we find that there is substantial evidence to support the trial court's conclusion that appellee Harpel Oil Company is entitled to pierce the corporate veil of Yost Brothers Company to reach the assets of Robert B. Yost's estate.

### Issue No. 2 for Decision

Was the appellee's claim properly and timely filed in the estate of Robert B. Yost?

We will hold that it was.

This issue comes on by reason of the fact that the appellee first filed a claim for $74,390.00 which was rejected. Then the claim was amended in order to recover $207,105.22, the amount of the court's judgment. The appellant argues that the plaintiff-appellee

"\* \* \* did not, however, ever allege or prove that it had filed a claim for any greater amount [than the $74,390.00], or that it properly amended its original claim, or that any other or amended claim had been rejected. These are necessary elements of pleading and proof, and the failure to plead and prove these elements prevents Plaintiff from stating a cause of action for any amount greater than $74,-390.00. *LoSasso v. Braun,* 386 P.2d 630, 632 (Wyo.1963) and 3 Bancroft's Probate Practice 2d Sec. 889."

■ There is no question but that the appellee filed its $74,390.00 claim with the estate in a timely fashion and has complied

with all statutory conditions precedent to filing suit. Section 2–7–717, W.S.1977 (1980 Replacement) requires:

"No holder of any claim against an estate shall maintain any action thereon unless the claim is first rejected in whole or in part by the personal representative and the rejection filed with the clerk * * *."

In response to this mandate, appellee first filed a claim in the probate proceedings pursuant to § 2–7–703(a), W.S.1977 (1980 Replacement), which provides in pertinent part:

"All claims whether due, not due or contingent, shall be filed in duplicate with the clerk within the time limited in the notice to creditors and any claim not so filed is barred forever."

The claim was rejected.

When the claim was filed, appellant reserved the right to supplement the claim. Paragraph 5 of the original claim provided:

"Liability of the individual, Robert B. Yost, may be primary, secondary, or founded on an agreement of which claimant is presently unaware and claimant reserves the right to amplify, supplement or correct this claim in subsequent discovery."

On the first day of trial, appellee orally moved to amend the claim. Appellant objected to the amendment and the trial court deferred its ruling on the amended claim. In a decision letter, the district judge noted:

" * * * It is the opinion of the Court that the original claims may contain a reservation of the right to amend the claim from time to time due to the difficulty encountered by the claimant in this matter in obtaining accurate information. *This situation is caused by the confused records of the parties and deaths of material witnesses* (Yost and Naylor). The *plaintiff specifically reserved the right to amend in his original claim* and the statute provides for equitable relief due to peculiar circumstances. An additional problem may be posed by the failure to file an amended claim from time to time. The proposed amended claim was only made orally to the Court and should be in writ-

ten form; however, the defendant certainly was not prejudiced thereby and was aware throughout discovery in the civil case of the nature of the proceedings and the areas being explored. It would seem in the interests of justice that the defendant's motion should be denied and the plaintiff directed to submit a formal written claim amending the original claim filed in the probate matter." (Emphasis added.)

The equitable relief to which the judge referred is contained in § 2–7–703(c), W.S. 1977 (1980 Replacement) relating to the filing of claims, which statute provides:

"This section shall not bar claimants entitled to equitable relief due to peculiar circumstances, if so found by the court in adversary proceedings."

Harpel Oil filed an amended claim on August 26, 1982, increasing the amount of the claim from $74,390.00 to $207,105.22, pursuant to order of the court. This claim was rejected on September 23, 1982. In response to the further order of the trial court, the amended claim was again filed on April 1, 1983, along with an application for an order directing the administratrix to satisfy this second amended claim. This order noted that the original claim reserved the right to amend the claim from time to time, that this reservation was reasonable due to confused records of the parties and deaths of material witnesses, that claimant had moved orally at trial to amend the claim and defendant was not prejudiced thereby, and that appellant was aware throughout discovery of the nature of the proceedings and the areas being explored. In an order entered May 6, 1983, the probate court allowed Harpel Oil's second amended claim against the estate of Robert B. Yost and directed the administratrix of the estate to pay the claim in the amount of $207,105.22 in due course of administration of the estate.

The purpose of the creditor's-notice period as set forth in § 2–7–703(a), W.S.1977 (1980 Replacement) is to insure that an estate can be settled in an orderly manner. *LoSasso v. Braun*, Wyo., 386 P.2d 630

(1963). Appellant had notice of appellee's claim and had ample opportunity to prepare for the litigation. As this court has held, the purpose of pleadings is to give notice to the parties. *Johnson v. Aetna Casualty & Surety Co. of Hartford, Conn.*, Wyo., 608 P.2d 1299, 1302 (1980). Appellant cannot claim that it did not have notice of the debt.

If appellant's theory is correct, creditors in actions against estates would be required to complete all discovery and research before the expiration of the creditor-notice period. This is not only practically impossible, but also contrary to the purpose of discovery, which is to give the parties the opportunity to learn all the facts, thus insuring litigation which can fairly establish the facts.

The public policy of speedy settling of estates was not thwarted here. A claim was filed and rejected and litigation promptly ensued, all in a timely fashion. There was no delay occasioned by the amendment of the claim.

The corporate veil was pierced, the amendment of the claim satisfied statutory requirements and the judgment must be affirmed.

Affirmed.

ROONEY, Chief Justice, specially concurring.

I do not believe it to be necessary to reach the issue in this case relative to "piercing the corporate veil." The trial court found that:

"* * * The plaintiff had received * * * oral assurances * * * from Robert B. Yost that he would as sole management and apparent owner of Yost Brothers Company assume responsibility for the indebtedness as it grew for gasoline products. * * * "

The testimony was to this effect. If corroboration is required to meet the requirements of the "dead man's statute," § 1–12–

102, W.S.1977[1], the unusual extension of credit over the long period of time and the July 28, 1964, written agreement provides the necessary corroboration. The agreement signed by Robert B. Yost provided in part that the stockholders, including Robert B. Yost:

"* * * individually guarantee the payment of all amounts due Harpels by Yost Brothers and hereby assume personal responsibility and liability for all such indebtedness."

I would affirm on this basis.

---

1. Section 1–12–102, W.S.1977, provides in pertinent part:

"* * * no judgment or decree founded on uncorroborated testimony shall be rendered * * * adverse to the person incapable of testifying or his trustee, executor, administrator, heir or other representative. * * * "