Maurice MILES and Meadowbrook Development, Inc., a Wyoming corporation, Appellants (Defendants),

v.

CEC HOMES, INC., a Wyoming corporation, and Inberg Surveying, Inc., a Wyoming corporation, Appellees (Plaintiffs).

No. 86–284.

Supreme Court of Wyoming.

April 13, 1988.

Robert O. Anderson and F.M. Andrews, Jr. (argued) of Andrews and Anderson, Riverton, for appellants.

Richard Kraemer of David B. Hooper, P.C., Riverton, for appellees.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

In this contract action, appellants Maurice Miles and Meadowbrook Development, Inc. appeal from judgments entered against them in favor of appellees CEC Homes, Inc. and Inberg Surveying, Inc. Appellants present the following issues on appeal: (1) Whether there was sufficient evidence to pierce the corporate veil of Meadowbrook Development, Inc.; (2) Whether Meadowbrook Development, Inc. should have been excused from its duty to pay CEC Homes, Inc. because of the failure of a condition precedent; (3) Whether the trial court erred in finding Maurice Miles personally liable to Inberg Surveying, Inc. on an open account; (4) Whether the trial court erred in granting attorney fees to CEC Homes, Inc.; and (5) Whether the trial court erred in granting Inberg Surveying, Inc. prejudgment interest in the amount of 1.5 percent per month.

We affirm in part, reverse in part, and modify.

Appellant Meadowbrook Development, Inc. (Meadowbrook) and appellee CEC Homes, Inc. (CEC) are Wyoming corporations which were engaged in the development of residential homes in Fremont County, Wyoming in the early 1980's. The two corporations owned subdivisions locat-ed on opposite sides of 18th Street in Riverton, Wyoming, and on December 3, 1980, they entered into an agreement to share the costs of developing the street. The common improvements contemplated by the agreement were the domestic water line, storm sewers, street construction and paving, and curb, gutter and sidewalk construction. The contract provided that there was "no priority as to which of the parties shall develop which common improvement" and that either party could proceed with development of the common improvements "as may be necessary for the development of the party's subdivision."

Early in 1981, Stanley Smalley, acting for CEC, and appellant Maurice Miles, president and majority shareholder of Meadowbrook, held discussions concerning the start of construction on the common improvements. CEC began developing the improvements in May 1981 and completed them in October or November of that year. On July 19, 1984, CEC billed Meadowbrook for its share of the costs, which amounted to $25,587.90. Meadowbrook failed to pay the bill.

Appellee Inberg Surveying, Inc. (Inberg) provided engineering services for both the Meadowbrook and CEC projects. The initial engineering and plat work for the Meadowbrook subdivision was completed by Inberg in 1981. Meadowbrook paid Inberg for those services in October 1981. In March 1983, market forces prompted a decision to replat the Meadowbrook land. The cost of Inberg's services for the replatting was $8,203.11. Meadowbrook never paid for those services.

On February 15, 1985, appellees CEC and Inberg filed an action to recover payment on CEC's contract with Meadowbrook and payment on the Inberg account. Both Meadowbrook and Maurice Miles were named as defendants. Appellees' claim against Miles was predicated on a theory of piercing the corporate veil.

After a bench trial, the court entered judgment against Meadowbrook and Miles. CEC was awarded $25,587.90, which represented the amount due under the cost-shar-

ing contract, and $6,201.12 for attorney fees. Inberg was awarded $8,203.11 for services and $5,364.23 in interest on its account with Meadowbrook.

## PIERCING THE CORPORATE VEIL

■ Appellants first contend that the trial court's decision to pierce the corporate veil of Meadowbrook was not supported by sufficient evidence. The standard of review we apply when evaluating such claims is well established:

"We have said that where the separate-entity doctrine is relied upon, each case must be governed by its own facts, *Opal Mercantile v. Tamblyn*, Wyo., 616 P.2d 776 (1980). Fact questions must be decided by the trier of fact, *Aetna Casualty and Surety Company v. Stover*, 327 F.2d 288 (8th Cir.1964); *H.A.S. Loan Service, Inc. v. McColgan*, 21 Cal.2d 518, 133 P.2d 391, 145 A.L.R. 349 (1943); *Opal Mercantile v. Tamblyn*, supra. We will not substitute our judgment for that of the trier of fact, findings of fact will be presumed to be correct and we will set them aside on appeal only where such findings are 'clearly erroneous or contrary to the great weight of evidence,' *Kvenild v. Taylor*, Wyo., 594 P.2d 972, 976 (1979); see also, *Plains Tire and Battery Company v. Plains A to Z Tire Co., Inc.*, Wyo., 622 P.2d 917, 920 (1981); *Shores v. Lindsey*, Wyo., 591 P.2d 895, 899 (1979). Additionally, in examining a fact issue,

" ' "We must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it." ' *Peters Grazing Association v. Legerski*, Wyo., 544 P.2d 449, 455 (1975), reh. denied, 546 P.2d 189 (1976), quoting from *Stock v. Roebling*, Wyo., 459 P.2d 780, 784 (1969).

"See also *Overcast v. Baldwin*, Wyo., 544 P.2d 464, 465 (1976)." *Yost v. Harpel Oil Company*, Wyo., 674 P.2d 712, 716 (1983).

In *Opal Mercantile v. Tamblyn*, Wyo., 616 P.2d 776, 778 (1980), we discussed the circumstances under which a corporate entity may be disregarded:

"Ordinarily, a corporation is a separate entity distinct from that of individuals comprising it. *State ex rel. Christensen v. Nugget Coal Co.*, 60 Wyo. 51, 144 P.2d 944 (1944); *Durlacher v. Frazer*, 8 Wyo. 58, 55 P. 306 (1898). This is true although all or a majority of the stock is owned by a single individual. *Durlacher v. Frazer*, supra; *W.D. Miller Lumber Corporation v. Miller*, 225 Or. 427, 357 P.2d 503 (1960). However, in an appropriate case and in furtherance of public policy or the ends of justice, the doctrine will be disregarded. *Peters Grazing Association v. Legerski*, supra; *State ex rel. Christensen v. Nugget Coal Co.*, supra; *Caldwell v. Roach*, 44 Wyo. 319, 12 P.2d 376 (1932)."

In *AMFAC Mechanical Supply Co. v. Federer*, Wyo., 645 P.2d 73, 77 (1982), we said that

" ' "[b]efore a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." ' " Quoting *Arnold v. Browne*, 27 Cal.App.3d 386, 103 Cal.Rptr. 775 (1972) (overruled on other grounds). See also *Minifie v. Rowley*, 187 Cal. 481, 202 P. 673 (1921).

We went on to list the following factors to be considered in determining whether a corporate entity may be disregarded:

" 'Among the possible factors pertinent to the trial court's determination are: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other

than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citation].' " 645 P.2d at 77–78 (quoting *Arnold v. Browne,* supra, 103 Cal.Rptr. at 781–82). See also *Yost v. Harpel Oil Company,* supra 674 P.2d at 717.

A number of these factors are present in this case.

There was evidence of inadequate corporate records and failure to maintain minutes. Miles' son, Matthew, testified that he took "notes" at annual meetings; these notes were never produced. Typewritten minutes of the meetings were prepared only after the lawsuit was filed. Apart from these "minutes" and several corporate tax returns, no other corporate records were produced.

The record also demonstrates a commingling of funds and other assets. The "minutes" of the corporation's 1983 annual meeting indicate that Miles "gave" the corporation funds to purchase two trucks which the corporation later gave to Miles and his son Matthew for unspecified services. In addition, Miles frequently infused his own funds into the corporation's accounts. Although Miles characterized these transactions as loans, he never produced any evidence of any notes or other similar documentation to support this assertion, despite repeated discovery requests. Miles also withdrew funds from the corporate account when he "felt like the time was appropriate." He characterized these withdrawals as either "draws" or reimbursements for expenses. Again, the record contains no corporate records to support his assertions. Given the absence of corporate records to substantiate Miles' characterization of the challenged transactions, the trial court was entitled to disbelieve his testimony.

Miles used the corporation to procure labor and services for himself. The corporation built storage units in Gillette and a retail office building in Jackson for Miles, without profit. The projects were not authorized by the corporation until four months after construction began. The corporation also built a garage on Miles' property. Miles maintained that he "reimbursed" the corporation for wages, materials and expenses for the garage, but again no records existed which would support this explanation.

There was evidence of unauthorized diversion of funds or assets to other than corporate uses. Miles testified that he gave away a corporate dump truck in exchange for snow plowing services at his personal residence.

In short, the evidence provided a sufficient basis for the trial court to find an absence of individuality or separateness between Miles and Meadowbrook. In addition, adherence to the limited liability concept under these circumstances would promote injustice. The existence of the corporation was entirely dependent on whether Miles wished to add to the corporate account or withdraw from it. This total domination of the corporation allowed Miles to use it as a conduit for his own affairs, then deplete its assets and ignore the claims of creditors. We will not sanction Miles' abuse of the corporate form.

We affirm the trial court's conclusion that Meadowbrook's corporate identity should be disregarded.

### CONDITION PRECEDENT

The cost-sharing contract between Meadowbrook and CEC contained the following provision:

"4. DEVELOPMENT: The parties agree that there is no priority as to which of the parties shall develop which common improvement. It is agreed, however, that the party taking on the activity of contracting for supplies, labor, and equipment for installation of any common improvement shall, prior to entering into any binding contract, inform the other party of the specifications of such proposed contract. The non-active party shall withhold its permission to proceed with the proposed contract only if such fails to present a reasonable cost and quality of supplies, labor, and equipment or a reasonable delivery and completion day."

Meadowbrook contended that this provision created a condition precedent to its obligation of payment, that the condition did not occur, and therefore it could not be liable on the contract.

A condition precedent is "'an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises.'" *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees, School District No. 25, Fremont County,* *Wyoming,* Wyo., 681 P.2d 1326, 1331 (1984) (quoting Calamari and Perillo, Law of Contracts § 11-3 (1977)). The distinction between conditions and promises, and the significance of this distinction, is succinctly discussed by Corbin as follows:

"A promise is always made by the act or acts of one of the parties, such acts being words or other conduct expressing intention; a fact can be made to operate as a condition only by the agreement of both parties or by the construction of the law. The purpose of a promise is the creation of a duty in the promisor; the purpose of constituting some fact as a condition is always the postponement or discharge of an instant duty (or other specified legal relation). The non-fulfillment of a promise is called a breach of contract, and creates in the other party a secondary right to damages; it is the failure to perform that which was required by a legal duty. The non-occurrence of a condition will prevent the existence of a duty in the other party; but it may not create any remedial rights and duties at all, and it will not unless someone has promised that it shall occur." 3A Corbin on Contracts § 633, p. 26 (1960).

It is possible that a single contractual provision may operate as both a condition and a promise:

"Of course a contract can be so made as to create a duty that the fact operative as a condition shall come into existence. * * * The non-performance would then have double operation, on the one hand preventing any instant duty in the [promisee] * * * and on the other creating a secondary duty in the [promisor] to pay damages. Such a condition might be described as a promissory condition." Id. at 27-28.

In the present case, paragraph four of the cost-sharing contract clearly contains an exchange of promises. CEC, the party initiating construction, promised that it "shall" inform Meadowbrook of the specifications of any contract prior to entering such a contract. These "specifications" are identified as the "cost and quality of sup-

plies, labor, and equipment" and a "delivery and completion day." In exchange, Meadowbrook promised that it "shall" withhold its permission to proceed with the proposed contract only if those specifications were unreasonable.

Appellants contend that these words of promise also created an implied condition precedent. They apparently feel that because the contract gave Meadowbrook the right to review specifications and withhold its permission to proceed if those specifications were unreasonable, it necessarily followed that Meadowbrook's duty to pay its share of the proposed contracts did not arise unless and until CEC informed Meadowbrook of the specifications. While we question this premise, CEC never seriously challenged Meadowbrook's interpretation of paragraph four. Instead, it attempted to show that it had performed its duty of informing Meadowbrook of the contract specifications. The parties have treated the obligation of CEC as a condition precedent to Meadowbrook's duty to pay; we will do the same for purposes of this appeal.

The traditional rule is that conditions precedent are to be strictly complied with. *Frank v. Stratford-Handcock,* 13 Wyo. 37, 77 P. 134 (1904). More recently we have held that substantial performance in good faith is sufficient in most cases to meet the harsh rule of complete and exact performance of a condition precedent. *Leitner v. Lonabaugh,* Wyo., 402 P.2d 713 (1965). Even applying the substantial performance standard, it is clear from the record that CEC did not comply with paragraph four. Smalley testified that he informed Miles of the cost of the excavating contractor. Meadowbrook was never informed of the cost and quality of supplies, labor and equipment, or a specific delivery day and completion day for any other contract.

As previously stated, the general rule is that a non-occurrence of a condition precedent excuses a party's duty of performance. This general rule is not without exceptions. One exception is stated in § 229 of the Restatement, Second, Contracts:

"To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a *material part* of the agreed exchange." (Emphasis added.)

Section 241 of the Restatement, supra, describes circumstances to be considered in determining whether a failure to render performance is material:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

Applying these considerations to the present case, we conclude that occurrence of the condition must be excused. It appears that appellants were deprived of a benefit which they reasonably expected— they were not given an opportunity to review contract specifications before construction began. But if any of the contract specifications were unreasonable, and appellants suffered any harm in this respect, they could be adequately compensated in damages for breach of contract. Appellants have made no such claim. In fact, throughout the course of this litigation, appellants have never contended that the quality and cost of labor and materials or the start up and completion dates were unreasonable. Yet appellants seek to totally avoid their obligation to pay their share of the cost of the improvements. This would amount to a total forfeiture of CEC's rights under the contract.

Appellants should not escape liability under the contract because of the failure of a non-material condition. We affirm the trial court's finding of liability.

## OPEN ACCOUNT

Both CEC and Inberg claimed that Meadowbrook's corporate veil should be pierced. In the alternative, Inberg contended that Miles was personally liable because it dealt with Miles personally and not with Meadowbrook. Appellants assert that the trial court erred in finding Miles liable under this latter theory. We need not address this argument because the court specifically found Miles personally liable to both appellants by piercing the corporate veil:

"The court finds specifically that the defendant Maurice Miles, under authority as set forth by the Wyoming Supreme Court in *Amfac Mechanical Supply Company v. Federer* (Wyo.), 645 P.2d 73, and the cases therein cited, and indeed under Wyoming case law as early as 1932 in the Case of *Caldwell v. Roach*, 12 P.2d 376 is personally liable for monies due and owing the *plaintiffs* * * *." (Emphasis added.)

We have already affirmed the trial court's conclusion that Meadowbrook's corporate identity should be disregarded because adherence to the limited liability concept would produce an unjust result. This principle applies equally to the claims of CEC Homes and Inberg. Therefore we will not address appellants' alternative argument.

## ATTORNEY FEES

The cost-sharing agreement between CEC and Meadowbrook contained the following attorney fee clause:

"If the non-defaulting party is required to place this document in the hands of an attorney for enforcement, the defaulting party agrees to pay the non-defaulting party's reasonable attorney's fees and costs incurred thereby."

At trial CEC sought to recover attorney fees pursuant to this provision. Inberg was not entitled to attorney fees and did not seek them.

CEC and Inberg were represented by the same attorney. In support of its claim for attorney fees, CEC introduced an affidavit of its attorney which provided an itemization of services and expenses incurred in representing both CEC and Inberg. This itemization did not separate the fees and expenses relating to CEC's claim from those relating to Inberg's claim. The court attempted to solve this problem by simply awarding CEC one-half of the total amount:

"The court further finds that there is due plaintiff CEC Homes, Inc. the sum of $25,587.90, and attorney fees in the amount of $6,201.12, such sum representing one-half of the amount as set forth in plaintiffs' Exhibit No. 10 and as testified to by witness Phifer; this court being unable to allocate specific work of plaintiffs' attorneys to specific plaintiffs and, therefore, dividing the sum equally."

Appellant contends that the attorney fee award was erroneous. We agree.

In addressing the subject of attorney fees, we have said that an award of attorney fees "necessarily carries with it a considerable amount of discretion in the trial court" and that this discretion "is based upon the court's experience and knowledge in that professional field in which it is deemed to have peculiar competence." *Lebsack v. Town of Torrington*, Wyo., 698 P.2d 1141, 1148 (1985). There must, however, be some proof or evidentiary basis for determining a reasonable fee. *Anderson v. Meier*, Wyo., 641 P.2d 187 (1982). We cannot discern from the record an evidentiary basis for the trial court's determination that CEC should receive one-half of the total amount of attorney fees. As far as we can tell, the only evidence to support this division of fees is the fact that there were two plaintiffs. This alone does not provide a sufficient evidentiary basis for the award.

The burden of proving the amount of an attorney fee award rests on the party seeking the award. See *Downing v. Stiles*, Wyo., 635 P.2d 808 (1981). Because CEC failed to carry this burden, we must reverse the attorney fee award.

## PREJUDGMENT INTEREST

Inberg was awarded interest on its claim at a rate of 1.5 percent per month, which was the rate that it customarily charged on its past due accounts. Appellants contend that the interest award was excessive, and that it must be limited to the statutory rate of 7 percent per year pursuant to § 40–14–106(e), W.S.1977.

When a contract is silent with respect to interest, prejudgment interest may be awarded at the statutory rate. *Rissler & McMurry Company v. Atlantic Richfield Company*, Wyo., 559 P.2d 25 (1977). When the parties have entered an agreement which provides for the payment of interest, a different rule applies:

> "Some contracts specifically provide for interest. Those cases can be decided upon their contract terms and regarded as compensation for the use of money or for the extension of credit. The contract in such instance itself governs interest by way of compensation or damages for breach." *Id.* at 31.

At trial, Inberg contended that its account with Miles constituted a contract which specifically provided for interest. In support of this argument, Inberg relied on the following provision which appeared at the bottom of each page of its billing statement to Miles:

> "Accounts unpaid, 30 days past date of billing, will accrue service charges at the rate of 1½% per month. This constitutes an annual rate of 18% per year."

In addition, Inberg introduced evidence that Miles had previously complied with this provision by settling his account in 1981 with a single payment which included amounts attributable to the 1.5 percent service charge. The last service charge reflected on the account was waived at the time by Inberg. Inberg contends that these facts establish an agreement to pay interest on the amount due for the replatting services performed in 1983. We cannot agree.

An agreement to pay interest can be express or implied. See generally 47 C.J.S. Interest and Usury § 11 (1982). But the mere appearance of a provision imposing interest on an invoice or billing statement is insufficient to establish an implied agreement for the payment of interest. *Scott v. Strickland*, 10 Kan.App.2d 14, 691 P.2d 45 (1984); *The Research Group, Inc. v. Sharp*, La.App., 430 So.2d 165 (1983).

We reject Inberg's suggestion that the prior interest payment by Miles in 1981 demonstrates a course of dealing which established an implied agreement for the payment of interest. The payment of the prior bill, which included interest charges, was merely a settlement of the contract for the initial platting services, which in our view was separate and divisible from the contract entered some 18 months later for replatting services. The record contains no evidence to support a conclusion that Miles agreed to pay interest on the replatting contract, which was the debt for which this action was brought. Accordingly, Inberg cannot be awarded interest above the statutory rate.

Affirmed in part, reversed in part, and modified as to interest.