In re ESTATE OF ROY K. WALLEN, Deceased (Fullco Lumber Company, Inc., Claimant-Appellant, v. Peter M. Donat, Adm'r, Respondent-Appellee).

Second District   No. 2—92—1199

Opinion filed May 6, 1994.

David J. Chroust and Kevin G. Drendel, both of Drendel, Schanlaber, Horwitz & Tatnall, of Aurora, for appellant.

Peter M. Donat, of Donat & Donat, P.C., of Batavia, appellee *pro se.*

JUSTICE McLAREN delivered the opinion of the court:

Pursuant to Supreme Court Rule 304(b)(1) (134 Ill. 2d R. 304(b)(1)), claimant, Fullco Lumber Company, Inc. (Fullco or claimant), appeals the denial of its claim against the estate of Roy K. Wallen (decedent) who died on April 2, 1988. On April 14, 1988, Peter M. Donat, an attorney, was appointed administrator of the estate with the will annexed. We affirm in part, reverse in part, and remand the cause for further proceedings.

On appeal, claimant contends that, because it obtained a money judgment against the lumber business of decedent, the judgment should be paid from assets of the estate. The thrust of claimant's first argument is that the trial court erred in refusing to "pierce the corporate veil" of R.K. Wallen Lumber Sales, Inc. (Wallen Lumber or corporation), and hold the estate liable for its claim where it was alleged that decedent, as sole stockholder, conducted the lumber brokerage business in such a manner that the personalities of the corporation and the individual no longer existed; thus, adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice in defeating the creditor's claim.

Alternatively, claimant argues, with much less precision, that fairness and equity require that the estate be held liable for the debts of the business where the estate continued to maintain and operate the business as an asset of the estate for later sale.

Fullco based its claim on a foreign judgment of $178,163.31 obtained in Alabama against R.K. Wallen Lumber Sales, Inc., an Illinois corporation. The judgment was initially entered in cause No. CV—87—106 in the circuit court of Winston County, Alabama, on April 11, 1988, and was entered as a final judgment there on June 7, 1988. On November 10, 1988, the foreign judgment, plus interest and costs, was registered as a final Illinois judgment in the Kane County circuit court in cause No. 88—MR—195, and on October 11, 1988, a claim based on the judgment was filed against the estate.

The written claim first alleges that, due to the entry of the judgment in the Alabama court and the registration of the judgment in Illinois, Fullco has a claim and a lien on all the accounts receivable and other assets of Wallen Lumber which "are or have been a part of and property of the Estate of Roy K. Wallen."

Alternatively, the document alleged that there is a claim and a lien against the assets of the estate because:

"There was a sufficient unity of ownership between Roy K. Wallen and R.K. Wallen Lumber Sales, Inc. The applicable corporate formalities were not observed by R.K. Wallen Lumber Sales, Inc., and the absence of corporate records and inadequate capitalization of R.K. Wallen Lumber Sales, Inc. all justify the piercing of the corporate veil *** and holding the Estate of Roy K. Wallen liable for judgment entered in favor of Fullco Lumber Company, Inc."

Prior to the hearing on the claim, on January 31, 1992, claimant served a notice to the administrator to appear and to produce the corporate records of Wallen Lumber; a list of all the shareholders of "R.K. Wallen" (Wallen Lumber) from the date of incorporation to the present; a listing of all the assets and accounts receivable of Wallen Lumber as of April 1, 1988; all bank statements, checkbooks and banking documents for any account in the name of "R.K. Wallen," Roy K. Wallen, and the estate of Roy K. Wallen or any account opened by the administrator from April 1, 1988, to the present; any bank statements or documents for any account through which receivables passed or bills of "R.K. Wallen" were paid from April 1, 1988, to the present; any stock certificates completed and issued to any stockholder; and any notes given by "R.K. Wallen" to Roy K. Wallen as evidence of loans made by Roy K. Wallen to "R.K. Wallen." Fullco also subpoenaed Harris Bank of Batavia for notes evidencing loans made by Harris Bank or its predecessor (First National Bank of Batavia) to Roy K. Wallen from January 1, 1987, through April 1, 1988, and any documents showing into what account at Harris Bank the loan proceeds from the loans were deposited.

Incomplete records were produced for the hearing. Copies of re-

cords from the Secretary of State (exhibit No. 3) showed that Wallen Lumber was incorporated in 1982, and the subscribers were Roy K. Wallen, Joseph Romano, Sr., and Joseph Romano, Jr. The number of shares proposed to be issued was 1,000 for a consideration of $2,000. The Secretary of State ultimately dissolved the corporation involuntarily on February 1, 1989. Exhibit No. 4 included the unsigned minutes of the first meeting of subscribers on May 10, 1982, and unsigned shares: 600 shares to Roy K. Wallen, and 200 each to Joseph Romano, Sr., and Joseph Romano, Jr. It appears that the administrator produced no other corporate documents from the period 1983 to 1988.

At the hearing on September 8, 1992, there was initially some objection by the administrator that the corporate records were incomplete and their admissibility questionable if the Dead Man's Act (735 ILCS 5/8—201 (West 1992)) was applicable and no one was present to testify regarding the documents. The court found that the documents were not covered by the Act and admitted them.

Richard D. Hughes testified that he was a senior vice-president of the Harris Bank Batavia National Association, a successor of the First National Bank of Batavia. He functioned as a lending officer and administrator of credit records of the bank. Hughes testified that a loan of $20,000 was made to decedent on February 9, 1987, and a second loan was made for $10,000 on June 9, 1987, as a renewal of a prior loan. A third loan to decedent was made on August 25, 1987, for $43,600 which was also a renewal of a prior loan. On March 3, 1988, a loan of new funds was made in the amount of $10,000, and another $10,000 loan of new funds was made on March 28, 1988.

Hughes further stated that the corporation had an account at the bank in February 1987. The corporate account was No. 9—725, and the $20,000 in proceeds from the February 1987 loan were deposited into that corporate account. The loan documents, admitted without objection as exhibit No. 18, were not signed "by the corporation" but by Roy K. Wallen. Those documents show a collateral assignment of an interest in a land trust dated March 2, 1985. The March 3, 1988, loan (exhibit No. 15) was signed by Roy K. Wallen, and the proceeds were deposited into account No. 9—725. The March 28, 1988, note (exhibit No. 16) for new funds was signed by Roy K. Wallen and the proceeds were also deposited into corporate account No. 9—725.

On cross-examination, Hughes stated that the notes were for business purposes and were denominated "working capital." On redirect examination, Hughes said that the bank insisted that the corporation sign off on the three notes involving new funds, but he did not have in his possession any copies of notes where the

corporation signed that it owed Roy K. Wallen individually. On the March notes, Hughes acknowledged that the March notes stated the purpose of the notes was "CONSUMER: WORKING CAPITAL." The use of the word "consumer" signalled to Hughes that there was a personal signature on the note as opposed to a corporate signature. Hughes acknowledged that the bank was looking to decedent individually as liable on the notes.

Patricia Wallen, the wife of decedent, testified that decedent operated a lumber brokerage business known as R.K. Wallen Lumber Sales, Inc. She cleaned the business office weekly. It was located in Plainfield and consisted of one large room with office furniture, a coffee area, and a bathroom. There were no storage facilities for lumber. She believed that the company did not buy lumber, store it and then ship it; rather, the broker effectuated transactions between buyers and sellers. She did not know of the monthly or yearly sales volume of the company. Mrs. Wallen also typed for approximately $1^{1}/2$ hours per week at home, but this did not involve invoices or letters. During 1987, she was paid $13,500 by the company and was paid $200 per week during the first three months of 1988. Decedent leased a Buick LeSabre which he used for the business. The Wallen home was mortgaged with Harris Bank Batavia.

Peter Donat testified as administrator of the estate. In searching for the corporate records, he did not find any of the notes which the corporation signed in favor of Roy K. Wallen individually. He testified regarding the five-page corporate bank statement (exhibit No. 7) covering January through May 1988. The funds left in the corporate bank account were transferred to the estate bank account. On June 21, 1988, the $35,060.87 balance in the corporate account in May was transferred to the estate account, No. 12459. The corporate statement shows that on May 10, 1988, there was a debit memo of $20,000 from the corporate account. Donat was uncertain whether the funds went into the estate account or whether they represented the payment on one of the notes. Donat also testified regarding checks written on the estate's account and signed by him (exhibit No. 10) to pay certain lumber companies. Donat related that decedent was a lumber broker who would be in contact with a party who ordered lumber; decedent would call another company to provide the lumber and the provider would ship the product directly; decedent would then receive a check from the purchasing company, and he would send a check to the seller. After his death, some orders were outstanding. When Donat determined which orders were open and which checks were coming in, the invoices were matched, and the suppliers whose bills were outstanding were paid through this estate account. Donat was aware

that Fullco had a claim outstanding. Donat said that he did not represent the corporation before Roy Wallen's death; rather, he represented him personally. However, Donat was aware of Fullco's claim because he helped to arrange for an Alabama attorney. The claim of Fullco was for lumber that Fullco had shipped through the Wallen Lumber brokerage. Some of the checks were written in June and July, and at least one was written as late as September 1988. Donat was also involved in the sale of the Wallen home after the estate was opened. There was no mortgage, but he believed that there was a collateral assignment on the notes.

Donat testified that a check dated June 21, 1988 (in exhibit No. 10) for $25,560.96 drawn on the estate account was referenced to the $10,000 notes and paid to the First National Bank of Batavia. Donat testified regarding a check dated September 27, 1988, for $3,677.46 paid to Harris Bank Batavia and one dated September 8, 1988, for $55,723.89 paid to First National Bank of Batavia. Part of the last amount included $25,000 Donat had borrowed on behalf of the estate to carry on the business; $29,500 of the amount was to pay for the loans decedent obtained prior to his death.

Donat testified that exhibit No. 11 represented a deposit of $67,653.68 on September 8, 1988, to the estate account; this amount consisted of mostly or all proceeds or receivables of the corporation. Donat explained that the estate attempted to run the business for a time after Roy Wallen's death in order to sell it. Bruno Dombro was hired to operate the business on behalf of the estate. The business was operated by telephone. Donat testified regarding bank statements of the estate (exhibit No. 17). On April 18, 1988, there was a credit memo of $20,000. When asked if this was a deposit into the estate from the corporate account, Donat replied that it was either from the corporate account or it represented money borrowed from the Harris Bank. Donat was also uncertain of the source of the $10,000 credit or deposit entered April 14. Donat stated that the majority of deposits were from sales of lumber or receivables.

At the close of claimant's case, the administrator first noted that there was no evidence presented concerning a perfected lien on the assets of the estate. He argued that the judgment against the corporation should be considered *res judicata* and could not be directed either against the estate or Roy Wallen personally; that the issue of liability could not be relitigated; and that the issue of the personal liability of Roy Wallen as sole stockholder should have been raised earlier. Next, the administrator argued that claimant did not meet its burden of proof and that, although Roy Wallen may have advanced funds to the corporation, this did not, without more, show the absence of a valid corporation.

Claimant argued that there was no identity of parties to apply the doctrine of *res judicata*, and that, as a practical matter, to deny this type of claim would require that, whenever there is a suit against a corporation, the individual owner would have to be named because the failure to follow corporate formalities is frequently discovered only in attempting to enforce the judgment by filing a citation to discover assets. Claimant further argued that the evidence showed decedent did not conduct the business as a corporate entity.

■ On appeal, claimant first argues that the trial court erred in not piercing the corporate veil. "A corporation is a legal entity which exists separate and distinct from its shareholders, officers, and directors, who are not, as a general rule, liable for the corporation's obligations." (*Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 1004.) One of the primary purposes of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity. (*Ted Harrison Oil Co. v. Dokka* (1993), 247 Ill. App. 3d 791, 794.) Limited liability will ordinarily exist even though the corporation is closely held or has a single shareholder. See *Gallagher*, 91 Ill. App. 3d at 1004.

When the application of the corporation's separate identity theory is based upon an intent not within its reason and purpose the application should not apply, the separate identity should be disregarded, and the corporation considered as an aggregate of persons both in equity and at law. (*Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 324.) Some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard or "pierce the corporate veil." (*Berlinger's*, 57 Ill. App. 3d at 324.) A corporate entity will be disregarded where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of the governing or dominant personality. *Dokka*, 247 Ill. App. 3d at 795.

■ A party seeking to pierce the corporate veil has the burden of making "a substantial showing that one corporation is really a dummy or sham for another" (*Pederson v. Paragon Pool Enterprises* (1991), 214 Ill. App. 3d 815, 820, 822), and courts will pierce the corporate veil only reluctantly (*Dokka*, 247 Ill. App. 3d at 795). Such a decision will be reversed where it is against the manifest weight of the evidence. (*Dokka*, 247 Ill. App. 3d at 796.) For a court to pierce the corporate veil, two principal requirements must be met: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of

a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Dokka*, 247 Ill. App. 3d at 795.

In determining whether to pierce the corporate veil, a court will not generally rest its decision on a single factor, but will examine many factors, such as: inadequate capitalization; failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of the other officers or directors; absence of corporate records; commingling of funds; diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; failure to maintain arm's length relationships among related entities; and whether, in fact, the corporation is only a mere facade for the operation of the dominant stockholders. *Webb v. Webb* (1989), 180 Ill. App. 3d 619, 622; *McCracken v. Olson Cos.* (1986), 149 Ill. App. 3d 104, 109; *Gallagher*, 91 Ill. App. 3d at 1005; see *Miles v. CEC Homes, Inc.* (Wyo. 1988), 753 P.2d 1021, 1024.

■ The administrator argues that the foreign judgment was entered against the corporation, an entity separate from the estate of decedent who was not named individually in that suit, and that the liability of the decedent individually should not now be "relitigated" because this issue is *res judicata*. Under the doctrine of *res judicata*, a judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same claim, demand, or cause of action. (*Fried v. Polk Brothers, Inc.* (1989), 190 Ill. App. 3d 871, 877.) The doctrine is based on the public policy which favors judicial economy and the finality of litigation. (*Fried*, 190 Ill. App. 3d at 877.) The essential elements of the doctrine are "an identity of parties, subject matter and cause of action" (*Fried*, 190 Ill. App. 3d at 877), and the doctrine applies not only to those issues which were actually raised but also to those which might have been raised in the first proceeding (190 Ill. App. 3d at 878).

■ The second branch of the doctrine, known as collateral estoppel or estoppel by verdict, applies when a party or someone in privity therewith takes part in two separate, consecutive cases arising from different causes of action and some fact controlling, or question material to, the determination of both cases has been adjudicated against that party in the prior case by a court of competent jurisdiction. *Fried*, 190 Ill. App. 3d at 878.

The doctrine, in this ordinary and traditional sense, has doubtful application here. First, the record is incomplete as to what was actually litigated or could have been litigated in the Alabama action.

The judgment grants an award of money against the corporation and not against Roy Wallen individually. The judgment recites that it was entered and filed "with no opposition having been filed." It does not appear from the record that decedent was ever sued individually or was ever called upon to defend against the issue of piercing the corporate veil. Thus, it cannot be said conclusively that there is an identity of parties (or their privies) or of issues.

Similarly, the theory of collateral estoppel, in its ordinary sense, is also inapplicable, because it does not appear from the record that the issue of corporate identity was ever litigated. However, we hasten to add that a foreign judgment should not be given greater effect in the forum State where it is registered than it had in the foreign jurisdiction that rendered it. *Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 7.

■ A foreign judgment is not subject to collateral attack in an Illinois court except for the defense of fraud in the procurement of the judgment or lack of jurisdiction in the rendering court. (*Ayers Asphalt Paving, Inc. v. Allen Rose Cement & Construction Co.* (1982), 109 Ill. App. 3d 520, 523.) An attack on the judgment is collateral where the action or proceeding has an independent purpose and contemplates some other relief or result. *Ayers*, 109 Ill. App. 3d at 523, citing *Buford v. Chief, Park District Police* (1960), 18 Ill. 2d 265; *Matthews v. Doner* (1920), 292 Ill. 592.

■ Under the full faith and credit doctrine, the forum court where enforcement is sought will not rehear a case on its merits because the judgment is "*res judicata* as to the nature and amount of the plaintiff's claim." (*Ayers*, 109 Ill. App. 3d at 523.) A foreign judgment *in personam* rendered against one who was not designated a party, or who was not made a party by service of process, is not entitled to full faith and credit in the enforcing jurisdiction, and it may not be enforced against the absent person, as a matter of due process of law. *Ayers*, 109 Ill. App. 3d at 523.

■ Thus, despite our observations concerning the inapplicability of the doctrine of *res judicata* in its usual sense, we believe claimant, in effect, seeks to collaterally attack its own foreign judgment by attempting to enforce it against the decedent personally; it is now too late to add the decedent individually as the intended judgment debtor *to the extent that this claim could have been raised* in the foreign jurisdiction. Under the circumstances, we think relief of this type should have been sought in the Alabama courts. See *Ayers*, 109 Ill. App. 3d 520 (in proceeding to register foreign default judgment against allegedly misnamed construction company, court was without authority to amend judgment to permit entry against correctly

named company as real party in interest where company was not named in original action and took no part therein, and any error was properly correctable in foreign court rendering original judgment).

Even if we did not find that this claim amounted to an impermissible collateral attack on the judgment, we would nevertheless find that claimant has not made the substantial showing necessary to pierce the corporate veil on the basis of Roy Wallen's alleged personal conduct in disregarding the corporate entity. Since decedent could not testify, and there is little conclusive documentation as to the manner in which he carried on the business, there is insufficient evidence to show that their separate identities no longer existed in fact. The corporation was duly registered with the Secretary of State until its involuntary dissolution in 1989, and the documentation named three incorporators; it was treated as a corporation in the Alabama lawsuit. A change of registered agent was filed in October 1988. Until after Roy Wallen's death, the corporation maintained a separate bank account. The corporation had a Federal employers' identification number and issued a W-2 form for Patricia Wallen. While it is true that Roy Wallen appears to have borrowed funds to invest in the corporation, there is no competent evidence available to show that he did not intend these obligations to be paid back to him by the corporation. The fact that the administrator was unable to produce most of the corporate records except for those described earlier does not manifestly negate the corporation's existence.

Although undercapitalization is an important factor in piercing the corporate veil, it is unclear that this corporation was undercapitalized given the nature of the broker's business. Wallen Lumber acted merely as a facilitator between buyers and sellers and did not maintain an inventory. That the company formed in 1982 was in financial difficulty by the time of Roy Wallen's death in 1988 is not dispositive of the issue. It appears that he was infusing cash into the business; therefore, it would be difficult to conclude that he intended to minimize its assets to the detriment of his creditors. There was no competent evidence presented to show that the company was undercapitalized in relation to the amount of business conducted or in relation to its corporate obligations.

Furthermore, since there is no evidence that the administrator had in his control all of the decedent's prior records, without more, we cannot impute an unfavorable evidentiary presumption arising from the failure to produce evidence under its control. (See *Berlinger's*, 57 Ill. App. 3d at 325 (unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control).) We cannot say that the trial court's deci-

sion not to pierce the corporate veil was against the manifest weight of the evidence.

■ Claimant next argues that it would be inequitable not to permit it to satisfy its debt from the assets of the decedent's estate. To the extent that claimant seeks to enforce its judgment against a successor to the *corporate assets* only, we will consider the propriety of this claim. Claimant did not specifically claim below that the corporate veil should be pierced because of the administrator's conduct in operating the business, but merely argued that it was equitable that it should reach (all of) the estate's assets. Claimant cites no authority holding that it should be able to obtain all of the estate's assets.

The administrator of an estate stands in the shoes of the decedent and acquires the same interest in the decedent's property that the decedent had, but no more. (*In re Estate of Ozier* (1992), 225 Ill. App. 3d 33, 37.) We have not been apprised of the administrator's authority to operate the corporation, and this issue has not been raised. See, e.g., *In re Estate of Aschauer* (1989), 188 Ill. App. 3d 63, 69 (administrator or executor has duty to close estate promptly and has no right to continue a decedent's business without incurring personal liability except in compliance with statutory requirements); see also 1A H. Horner, Horner Probate Practice & Estates § 508 (4th ed. 1985).

The duties of the administrator are generally to collect the estate, convert it into cash, and distribute it to those entitled thereto. (*In re Estate of Storer* (1971), 131 Ill. App. 2d 1049, 1054.) It is a primary duty of an executor or administrator to account to the court for his administration of the estate; the purpose of the accounting is to show his compliance with his duties to heirs, beneficiaries, and creditors. (*In re Estate of Thomson* (1986), 139 Ill. App. 3d 930, 936.) The administrator with the will annexed has all the powers and duties of the executor under a will. (755 ILCS 5/6—14 (West 1992).) Like the executor, the administrator is the representative of the decedent and all those interested in the estate, such as creditors, heirs, legatees, and devisees; he is a fiduciary to those interested in the estate and, as such, is held to a high standard of fair dealing and diligence. *In re Estate of Garbalinski* (1983), 120 Ill. App. 3d 767, 772; *In re Estate of Venturelli* (1977), 54 Ill. App. 3d 997, 1002; see *Wilmere v. Stibolt* (1987), 152 Ill. App. 3d 642, 645 (when administrator acquires possession of the assets of the decedent, title vests in the administrator as a quasi-trustee or trustee for the benefit of creditors, distributees, and legatees).

In representing decedent in his capacity as controlling shareholder, the administrator also has a separate fiduciary duty to the

corporation itself and cannot misappropriate corporate assets (see *Graham v. Mimms* (1982), 111 Ill. App. 3d 751). When a person acting in the position of corporate fiduciary or trustee commingles trust funds with nontrust funds, he has the burden of untangling the mess. (*Graham*, 111 Ill. App. 3d at 766, citing *Robert P. Butts & Co. v. Estate of Butts* (1970), 119 Ill. App. 2d 242, 248.) We believe the assets of the closely held corporation should have been segregated from those of the decedent's personal estate until the corporation was properly liquidated. Although we have determined that claimant should not be permitted to pierce the corporate veil, under the circumstances, it should be allowed to make its equitable claim against any assets which can be traced from the corporation into the possession of the estate. In the case at bar, once claimant made a specific showing that the administrator commingled the assets of the corporation with those of the estate, the burden shifted to the administrator to sort out and account for those assets as he was in the best position to know of them. *Graham*, 111 Ill. App. 3d at 766-67.

By way of example, in a probate proceeding, a claim founded upon an equitable theory, such as a constructive trust, is within the jurisdiction of the court (*Hobin v. O'Donnell* (1983), 115 Ill. App. 3d 940, 942), and the claim need not be set forth with the particularity required of a formal pleading so long as it states sufficient information to describe the nature of the claim or the relief sought (*Sheetz v. Morgan* (1981), 98 Ill. App. 3d 794, 800-01). A constructive trust may be imposed where the person in possession of property would be unjustly enriched if he were permitted to retain that property. (*Chicago Park District v. Kenroy, Inc.* (1982), 107 Ill. App. 3d 222, 224.) Where one retains property under circumstances whereby in equity and good conscience he ought not keep it, recovery will be allowed under a theory of constructive or resulting trust; this type of remedy is available under a variety of circumstances, and it is not always necessary that fraud or a breach of a fiduciary relationship be present to impose such a trust. *In re Estate of Engel* (1980), 87 Ill. App. 3d 273, 275; see *Kenroy*, 107 Ill. App. 3d at 224-25.

In the present case, we believe claimant set forth generally the basis for an equitable claim against the estate. Since claimant made a showing that the assets of the corporation came into the possession of the estate, we believe it ought to be able to enforce its claim against those assets and profits derived therefrom to the extent possible and subject to any offsets for expenditures on behalf of the corporation. Claimant made a sufficient showing to require the administrator to sort out and account for the corporate assets and profits, if any.

It is not for this court to perform the trial court's fact-finding function of tracing the assets of the corporation. We leave it to the trial court to fashion an appropriate and just remedy. We therefore reverse the trial court's denial of the equitable claim against the estate and remand the cause for further proceedings, including a new evidentiary hearing, so as to permit claimant to enforce its claim under any procedure consistent with the Probate Act of 1975 (755 ILCS 5/1—1 *et seq.* (West 1992)). On remand, the trial court starts with a clean slate as to this portion of the case. See *Graham*, 111 Ill. App. 3d at 768-70.

For the foregoing reasons, the judgment of the circuit court is affirmed as to its denial of the claim on the theory of piercing the corporate veil; the judgment is reversed as to defendant's equitable claim against the assets or profits of the corporation, if any, that came into the possession of the decedent's estate; and the cause is remanded for further proceedings consistent with the views expressed herein.

Affirmed in part; reversed in part and remanded.

WOODWARD and PECCARELLI, JJ., concur.