810 P.2d 113 (1991)
In the Matter of the ADOPTION OF, G.A.R., J.E.R., A.S.R., and J.R.R.
E.R., Petitioner (Respondent below),
v.
L.T. and E.M.T., Respondents (Petitioners below).
No. C-90-8.
Supreme Court of Wyoming.
April 23, 1991.
*114 John M. Burman, Designated Faculty Supervisor and Carol Warnick, Student Intern, Wyoming Legal Services, Laramie, for petitioner.
Cherie Shelton Norman of Skiles, Hageman & Butler, Laramie, for respondents.
Before URBIGKIT, C.J., THOMAS, MACY, and GOLDEN, JJ., and ROONEY, Retired J.
ROONEY, Justice, Retired.
This matter is before this court upon a grant of a petition for certiorari[1] to review the district court's denial of a motion for a new trial after the trial court granted the petition for adoption of the four minor children of E.R. and E.M.T. without the consent of E.R. and over his objection.
We affirm.
E.R. words the issues here presented to us:
"I. Whether the trial court erred in determining that [E.R.] was legally responsible for the support of his children pursuant to Wyo. Stat. § 14-2-204, the liability for support statute?
"II. Whether the trial court erred in finding that there was clear and convincing evidence that [E.R.] willfully failed to contribute to the support of or abandoned his children?"
E.R. and E.M.T. were married July 4, 1981. They had four children: G.A.R., J.E.R., A.S.R., and J.R.R.E.M.T. filed for divorce from E.R. in January 1987. E.R.'s whereabouts were unknown and service was made by publication. The divorce was finalized on July 13, 1987. E.R. was awarded visitation rights upon giving E.M.T. one week's notice of intent to exercise visitation and provided he not remove the children from the city in which E.M.T. resided. The decree provided that E.R. "shall be responsible for child support." The amount of child support and other provisions relative thereto were not ordered inasmuch as the court did not have personal jurisdiction over E.R.E.M.T. married L.T. on November 21, 1987.
W.S. 1-22-110 provided in pertinent part:[2]

*115 "(a) * * * the adoption of a child may be ordered without the written consent of the parents or putative father * * * if the court finds that the nonconsenting parent or putative father has:
* * * * * *
"(iii) Willfully abandoned or deserted the child; or
"(iv) Willfully failed to contribute to the support of the child for a period of one (1) year immediately prior to the filing of the petition to adopt[.]"
The district court made a factual finding "by clear and convincing evidence that the respondent father has willfully abandoned or desserted [sic] his children or that he has willfully failed to contribute to the support of the children for one year immediately prior to the filing of the Petition to Adopt."

LIABILITY FOR SUPPORT
E.R. argues that:
"Since there was no in personam jurisdiction [over him in the divorce proceedings], and no specified amount of child support [contained in the divorce decree, he] was under no obligation to pay support to his children which could lead to the adoption of his children, over his objection, for willful failure to pay support."
His argument overlooks the obligation for parental support of minor children which exists absent a court ordered duty to do so. We recognized this common law duty in Warren v. Hart, 747 P.2d 511 (Wyo. 1987). As L.T. and E.M.T. noted in their brief, the court there quoted from I Chitty's Blackstone, Commentaries on the Laws of England, Pt. I and II at 368 (1838):
"`The duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation, says Puffendorf (b), laid on them not only by nature herself, but by their own proper act, in bringing them into the world: * * *. By begetting them, therefore, they have entered into a voluntary obligation to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have the perfect right of receiving maintenance from their parents.'"
Warren, 747 P.2d at 514 n. 1.
There may be instances in which a court can define or limit this common law duty, but, properly, such was not done here. Rather, the court expressly recognized the continuance of the duty in the divorce decree insofar as it could, absent personal jurisdiction. The duty being thus recognized, the failure to perform it is actionable.
"Any person legally responsible for the support of a child under the age of eighteen (18) years who abandons, deserts, neglects or unjustifiably fails to support the child is liable for support of the child. It is no defense that the child was not or is not in destitute circumstances."
W.S. 14-2-204(a).
E.R. had a duty to contribute to the support of the minor children prior to the time of their adoption.

FAILURE TO SUPPORT
After contending that he had no duty to support the minor children, E.R. argues, perhaps inconsistently, that he did not willfully fail to contribute to such support. We agree with the trial court to the contrary, even under the restrictive standard for review of the evidence in matters such as this:
"[I]t is a fundamental right for one to have custody of his minor child, and that we must therefore consider the evidence with `strict scrutiny.'"
Matter of Parental Rights of PP, 648 P.2d 512, 513 (Wyo. 1982).
"`* * * [A]doption statutes are strictly construed when the proceeding is against a non-consenting parent and every reasonable intendment is made in favor of that parent's claims. * * *' *116 Matter of Adoption of Voss, Wyo., 550 P.2d 481, 485 (1976). See DS v. Department of Public Assistance and Social Services, Wyo., 607 P.2d 911, 918 (1980).
"Such strict construction is mandated by the fact that parental rights are fundamental rights. A strict construction of § 1-22-110(a)(iv) * * * requires interpretation of the words `contribute to the support' and careful examination of the facts of the case to determine if such contribution was made, and, if not, whether the failure to do so was `willful.'
* * * * * *
"* * * At least, such contributions, which are necessary by the nonconsenting parent to prevent adoption without his consent pursuant to § 1-22-110(a)(iv), must be `substantial' or `regular' or `constitute a material factor' in the child's support."
Matter of Adoption of CCT and CDT, 640 P.2d 73, 74-76 (Wyo. 1982).
The evidence in this case does not reflect contributions by E.R. to have been "substantial" or "regular" or sufficient to constitute a "material factor" in the support of his children. E.R. testified that he made periodic gifts to the children on some birthdays and on some Christmases. As noted by the trial court, periodic gifts are not sufficient to meet a support obligation. Id. Here, certainly, they were not a substantial, regular or material factor in the support of the children.
E.R. testified that he made some occasional cash payments to E.M.T. He could not recall the exact times or amounts of such payments. E.R. testified with reference to making support payments:
"Q. Do you consider yourself employable?
"A. Very much so.
"Q. And you don't have trouble finding jobs; is that correct?
"A. No, not in Colorado. Jobs are kind of scarce here in Laramie.
"Q. But you don't have trouble finding employment in Colorado?
"A. No, I don't.
"Q. And have you been employed most of the time since 1987 to the present?
"A. Yes.
"Q. And you've been earning money; is that correct?
"A. Yes.
"Q. And you've been able to support yourself; is that correct?
"A. Yes.
"Q. Have you given any support to [E.M.T.] for your children since July of 1987?
"A. Yes.
"Q. And what support have you given her.
"A. On different occasions, I've provided her with cash money, $100, $200 when I could.
"Q. Do you have any proof of that?
"A. No, I didn't. We had an understanding that I would give her money when I could, and she would let me see the kids; and I hardly ever seen the kids, even when I did give her the money.
* * * * * *
"Q. Did anyone ever see you give [E.M.T.] any money for the support of your children?
"A. [E.M.T.] and I have always been real private. The hand-off? No.
"Q. No one was present when you gave her this money?
"A. No.
"Q. And when did you give her this money?
"A. Well, on different occasions when we met. We met at Taco Bell. We met at Kentucky Fried Chicken, Washington Park. That's probably about it. There were a couple of cases when I met her at the park.
"Q. And no one was present?
"A. No. They knew I was going to meet with her, but, no, they were not present.
"Q. Do you have dates as to when you gave her this money?
"A. Specific dates, I do not. I don't keep very good records. No, I don't.
"Q. Do you remember months?

*117 "A. No, I don't.
"Q. How about years?
"A. Years, yes.
"Q. Okay, 1987, how much did you give her in child support?
"A. In child support in 1987, it varied. Probably $1,000.
"Q. And 1988, did you give her any child support?
"A. That was '88, I'm sorry. That was '88. In '89, I did. '87, no. We were  we were barely getting the divorce then, in '87. '86, no.
* * * * * *
"Q. Did you give [E.M.T.] any money in 1989 for the support of your children?
"A. Yes, I did.
"Q. And how much?
"A. 1989, I met with her three times and approximately $600.
"Q. Do you have any proof of that?
"A. No, I don't.
"Q. And you paid her in cash?
"A. Uh-huh.
"Q. Was anybody else present?
"A. No.
"Q. Do you know the dates?
"A. No, I don't.
"Q. Do you know the months?
"A. No, I don't. I don't recall now the months that I met with her.
* * * * * *
"Q. And where did you go to pay her this money? Tell us about that.
"A. Well, at one time we met at Taco Bell on Grand Avenue. We also met at Kentucky Fried Chicken, at Washington Park. We drove in the city  town. That was it.
* * * * * *
"Q. Did anyone else come with her when she came to see you at these places?
"A. No, she usually came by herself. She always came by herself.
"Q. Did anyone else come with you?
"A. No, no.
"Q. And how was the transfer of money  in what form was the money that you gave her?
"A. It was cash. * * *
* * * * * *
"Q. Did you ever give [E.M.T.] a check?
"A. No. I pay everything in cash.
"Q. Why is that?
"A. My dad taught me that lesson a long time ago. He's always paid everything in cash. I've never had a bank account. It was just always easier for me. There was times that I borrowed $100 from by father to give to her, and I didn't have time to go get a money order or anything like that.
"We had an agreement, basically, that we didn't need  I didn't need to have any records, because we had an understanding.
"Q. Did you ever ask [E.M.T.] for a receipt?
"A. No, I never asked her for a receipt. I trusted her.
* * * * * *
"Q. Okay. [E.R.], you have testified that you have given [E.M.T.] money and that you met her on two or three occasions. Did those occasions occur in 1987?
"A. No, they didn't.
"Q. Did those occasions occur in 1989?
"A. Yes.
"Q. Let's take the first occasion. What month was it?
"A. I don't recall what month it was.
"Q. Was it cold? Was it warm?
"A. It was in the fall, I think. It was cool.
"Q. Was it the fall of '89?
"A. It was cool. I don't remember what month it was.
"Q. So you said it was in the fall of '89; is that correct?
"A. I could be wrong.
* * * * * *
"Q. (By Ms. Norman) [E.R.], where did you meet her on that occasion?
"A. On which occasion?

*118 "Q. The first occasion in 1989 when you met with [E.M.T.]?
"A. I can't be sure. I think it might have been at Kentucky Fried Chicken.
"Q. And what time of day was it?
"A. It was in the afternoon.
"Q. And the next occasion you claim that you met with her, where was that?
"A. At Washington Park.
"Q. Do you remember what month?
"A. I don't.
"Q. Do you remember what year?
"A. It was in '89.
"Q. What about the third occasion?
"A. I can't be sure.
"Q. Do you know where you met then?
"A. No, I don't. It was probably Taco Bell. I'm not sure.
"Q. Do you remember what month?
"A. No, I don't.
"Q. Do you remember what year?
"A. I'm sure it was like the end of '88. I really can't be sure. It's been a while. I've had a lot of other things  I don't remember.
"Q. Isn't it possible that none of these occasions occurred in '89, and they did in fact occur in '87 or '88?
"A. '88 and '89 is when they occurred, I'm sure. The months I cannot  I know that the weather was well, because I drove down. On one occasion when I came down, it was rather cold, because the roads were bad; but, no."
Accepting E.R.'s testimony, the payments were not "substantial," "regular," or sufficient to constitute a "material factor" in the support of his children.
Additionally, there was a direct conflict of evidence in this respect. E.M.T. denied that she received any cash payments from E.R. The district court accepted E.R.'s evidence on this point. It is the province of the district court to make factual determinations. We review them only for an abuse of discretion.
"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances."
Martinez v. State, 611 P.2d 831, 838 (Wyo. 1980).
We have said before:
"`* * * We will examine the evidence in the light most favorable to the appellee and will resolve all conflicts in evidence for the appellee. We will assume the evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may fairly be drawn from it.'"
TR v. Washakie County Department of Public Assistance and Social Services, 736 P.2d 712, 715 (Wyo. 1987) (quoting DS v. Department of Public Assistance and Social Services, 607 P.2d 911, 919-20 (Wyo. 1980)) (citations omitted).
"Strict scrutiny" of evidence does not require a disregard of evidence in which there is a conflict. If it did, any piece of evidence could be rendered inoperative in a case requiring "strict scrutiny" through a simple contest of its veracity.
The trial court did not act in a manner exceeding the bounds of reason under the circumstances of this case. It could reasonably conclude as it did. It did not abuse its discretion.
E.R. argues that his failure to contribute to the support of the children was not "willful."
"As used in the context of § 1-22-110(a)(iv) * * * willfully means intentionally, knowingly, purposely, voluntarily, consciously, deliberately, and without justifiable excuse, as distinguished from carelessly, inadvertently * * * or thoughtlessly."
Matter of Adoption of CCT and CDT, 640 P.2d at 76.
E.R. acknowledged that E.M.T. was on welfare and had requested support money *119 from him, and that he has been steadily employed, earning $5.00 and $6.00 an hour. His failure to furnish some support money was not due to inadvertence, carelessness or thoughtlessness. He knew of the whereabouts of E.M.T. and his children. He did not present any justifiable excuse for failure to contribute to the support of his children. The trial court did not err in finding such failure to be "willful."

ABANDONMENT
Inasmuch as the evidence was sufficient to support the finding that E.R. willfully failed to contribute to the support of the children for a period of one year prior to the filing of the petition for adoption, making unnecessary his consent to the adoption, we need not address the issue concerning abandonment.
Affirmed.
NOTES
[1] An appeal by E.R. was dismissed by this court as being untimely. E.R.'s subsequent Petition for a Writ of Certiorari was granted.
[2] A 1990 amendment changed the first quoted paragraph to read:

"(a) * * * the adoption of a child may be ordered by the court without the written consent of a parent or the putative father * * * if the court finds that the putative father or the nonconsenting parent or parents have."