2002 WY 26

**In the Matter of the ADOPTION OF KJD, minor child.**

**MTM, Appellant (Respondent),**

**v.**

**LD and ED, Appellees (Petitioners).**

**No. C–01–2.**

Supreme Court of Wyoming.

Feb. 14, 2002.

MTM, Pro Se, Representing Appellant.

Hardy H. Tate, Sheridan, WY, Representing Appellees.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] Acting pro se, MTM (the father) appeals from an adoption without consent that terminated his parental rights to his daughter, KJD. The adoptive parents, appellees LD and ED, are KJD's maternal grandparents.[1] The child's mother, KAD (the mother), is deceased. Finding no abuse of discretion by the district court, we affirm the Final Decree of Adoption entered pursuant to Wyo. Stat. Ann. § 1–22–110(a)(v) (LexisNexis 2001).[2]

## ISSUES

[¶ 2] As appellant, the father's issues for review are not particularly well defined. However, it is clear that he desires:

1. A jury trial concerning his parental rights.

2. A conflict of interest to be found in the grandparents' counsel taking part in the proceeding while counsel also served as a court magistrate.

3. Reversal of the Final Decree of Adoption.

[¶ 3] The appellees (the grandparents) phrase the issues as:

1. Did the district court err or abuse its discretion in determining that clear and convincing evidence was presented to satisfy the statutory elements re-

---

1. ED is KJD's step-grandmother.

2. Wyo. Stat. Ann. § 1–22–110(a) reads, in pertinent part:

   In addition to the exceptions contained in W.S. 1–22–108, the adoption of a child may be ordered without the written consent of a parent or the putative father if the court finds that the nonconsenting parent . . . [has]:

   * * *

   (v) Willfully permitted the child to be maintained in or by a public or private institution or by the department of family services for a period of one (1) year immediately prior to the filing of the petition without substantially contributing to the support of the child[.]

   The petition for adoption also contained an allegation under subsection (iv) of the statute, having to do with not bringing a child support obligation current, but the district court ruled in favor of the father on that issue and it is not now before this Court.

quired to permit an adoption without consent of the parent or putative father under Wyoming Statute § 1–22–110(a)(v).

2. Did the district court err by denying appellant's demand for a jury trial.

3. Did a conflict of interest exist or was a Wyoming court rule violated by virtue of appellees' attorney serving as a court magistrate or court commissioner.

## FACTS

[¶ 4] This appeal constitutes one more chapter in a saga that has been ongoing since 1992, involving the father, the Natrona County and the Sheridan County Departments of Family Services (DFS),[3] the minor child KJD, and the grandparents. KJD was born on November 27, 1987, in Birmingham, Alabama, and resided with her parents in Clanton, Alabama, until May 1992. Her father was arrested in May 1992 for possession of marijuana. Shortly thereafter, her mother packed up her and KJD's belongings, and she and KJD left the state. They were in Baltimore, Maryland, for a short period of time, and then made their way to Wyoming where the mother's father and brother lived.

[¶ 5] During the four years KJD lived in Alabama with her parents, she remembers that her mother was often intoxicated and her father smoked marijuana. She testified that her father once tied up her mother, abusing and hitting her. After an abuse/ne-glect report was filed in January 1988, the Alabama Family Services Department became involved with the family. There were five reports concerning KJD as of February 1992. The last two reports, received in February 1991 and February 1992, alleged that the father had physically abused and neglected KJD; however, the record does not indicate whether the abuse or neglect was substantiated or adjudicated.

[¶ 6] The mother was incarcerated in Casper for public intoxication in May 1992. After a juvenile court hearing on June 2, 1992, KJD was placed in protective custody with DFS.[4] Subsequently, the mother worked on her sobriety and tried to achieve the case plan goals developed for her by DFS. DFS provided the mother with psychological treatment, alcohol treatment, and allowed her visitation with KJD. The mother moved into a facility in Casper for mothers and children, where she continued her treatment. She was able to stay sober for two months at a time, and came close to family reunification, but she would begin drinking again and reunification would not occur.

[¶ 7] The father began his involvement with DFS in January 1993, after he learned that KJD had been placed in DFS' protective custody. He called DFS from Alabama stating his intention to regain custody of KJD. The mother had advised DFS that she did not know who KJD's father was, and no father's name was listed on KJD's birth certificate.[5] A DFS worker explained to the

---

3. Throughout an approximate eight years, DFS offices in Natrona County and Sheridan County have been involved in this matter. No distinction will be made herein between the two county DFS offices and, therefore, these agencies will be referred to collectively as DFS.

4. While it is not essential, it may be helpful to know the somewhat complicated history of this adoption proceeding and related cases. The juvenile case that resulted in KJD's placement with DFS began in the juvenile court of the Seventh Judicial District, in Casper, where it was assigned to Judge Park. The case plans and case plan reviews discussed herein occurred within that case. The adoption proceeding upon which this appeal is based occurred in the Fourth Judicial District, in Sheridan. Judge Brackley, the sitting district judge in Sheridan, first was assigned to the adoption case. He recused himself in July 2000, and assigned the case to Judge Kalokathis, who is from Cheyenne, due to perceived allegations made against Judge Brackley by the father. In October 2000, Judge Kalokathis reassigned the case to Judge Brackley because he could not timely set a hearing on the petition. Judge Brackley immediately assigned the case to Judge Spangler, a retired judge from Casper. The father then promptly peremptorily disqualified Judge Spangler. In November 2000, Judge Spangler assigned the case to Judge Park, the Casper judge who presided over the juvenile case. Venue remained in Sheridan and the case continued to be docketed as a Fourth Judicial District case.

5. The father filed a petition to establish paternity on August 4, 1994. An Order of Paternity dated October 6, 1994 established paternity of KJD in the father.

father that a home study on his Alabama residence would be necessary before placement could be made. In compliance with the Interstate Compact for Placement of Children (ICPC), DFS initiated a home study on the father's Alabama residence on March 1, 1993.

[¶ 8] The father hitchhiked from Alabama to Casper in March 1993. He lived at the Central Wyoming Rescue Mission for several weeks, and again contacted DFS concerning custody of KJD. He then moved into a tent at his place of employment, and DFS conducted a home study on this residence. The mother informed DFS that the father had abused her and KJD, and she did not want KJD placed with the father. DFS again discussed with the father the steps he would need to take in order to gain custody of KJD, but he was uncooperative and failed to follow through on all except one of the recommendations.[6]

[¶ 9] DFS contacted KJD's maternal grandparents in the summer of 1993, and they agreed to have a home study conducted for possible placement of KJD with them. In August 1993, the mother moved to Sheridan to live with LD and ED. On October 5, 1993, DFS completed its home study on the father and denied placement of KJD with him because of his living environment—a tent rather than a single-family dwelling. DFS completed its home study on the grandparents on September 22, 1993, and placed KJD with them on October 8, 1993. DFS received the ICPC home study regarding the Alabama residence on October 20, 1993, and placement was denied because the father no longer lived there.

[¶ 10] The father continued to live in Casper from October 1993 to June 1994, but he had minimal contact with DFS. He remained homeless, did not provide DFS with a phone number or address where he could be reached, did not attend individual and family counseling as recommended by DFS, and did not obtain any long-term employment, even though he was working odd jobs at this time. The father did contact DFS for visitation

with KJD, and he was allowed to see KJD in a supervised setting on a regular basis, one time per week for two hours.

[¶ 11] KJD began counseling during this time at the Northern Wyoming Mental Health Center, as her step-grandmother felt KJD was exhibiting upsetting behaviors. KJD's counselor indicated that her "acting out" was related to visits with her father, and was attributable to anxiety stemming from things her father said to her as well as her fear of being forced to move to Alabama with him. The father moved to Sheridan in June of 1994 to be closer to KJD. There were reports that he lived under a bridge, but he told DFS that he lived in a van next to his place of employment. Meanwhile, the mother returned to Casper as she could not maintain her sobriety, which was a condition of living in her father's home in Sheridan. She was subsequently killed in a pedestrian/motor vehicle accident in September 1995.

[¶ 12] On September 15, 1994, DFS met with the father to develop a case plan for reunification with KJD. The plan included, among other things, that the father would attend parenting classes, attend individual and family counseling, continue to have supervised visits with KJD, obtain suitable housing for himself and KJD, and obtain suitable employment and adequate income to support them both. The father stated in this meeting he intended that his employment would consist of suing three DFS workers for five million dollars each, and one worker for ten million dollars; the father felt that both he and KJD would be able to live adequately off these lawsuits. The father did not sign this or any subsequent case plan developed by DFS to reunify him with his daughter.

[¶ 13] A review of the case plan, with the continued goal of reunification, was made and the plan was updated on July 16, 1996, because KJD was becoming upset by her visits with her father. He gave her a hard time for taking medication for her attention deficit disorder, he came to the visits in an unkempt condition, and he was disrespectful with DFS

---

**6.** The father did attend a parenting class once he moved to Sheridan and provided DFS with verification of his attendance.

and Court Appointed Special Advocate (CASA) workers. The short-term goal for the father in the updated case plan was to make visitations with KJD more positive and enjoyable by not making any inappropriate comments to her. It also included that the father would pay child support in the amount of fifty dollars per month, beginning August 1, 1996.

[¶ 14] Another review of the case plan was undertaken on June 30, 1997. The goal continued to be reunification, but first the father had to develop a better relationship with KJD. DFS indicated that it would pay up to fifty-five dollars per hour for counseling for the father, but it would require monthly reports from his therapist regarding his counseling efforts. The plan stated again that the father was to pay fifty dollars per month child support. Furthermore, he was to follow the guidelines, which were essentially the same as had been set forth in a letter dated May 14, 1997, and which had been sent to his attorney.[7] It also stated that KJD could request that no visitation take place, and if no progress was evident in three months (by the end of September 1997), DFS would request a court hearing to ask for permanent placement of KJD with the grandparents. The father left for Florida in October 1997 and did not return to Wyoming until July 1998.[8]

[¶ 15] A further review on October 26, 1999, changed the father's visitations to every other week for one hour, which were to be supervised by CASA workers. The father was to be responsible for a five-dollar payment to CASA to supervise each visit, and he was to treat the CASA staff with courtesy and respect. The stated goals for the father were to attend counseling on a weekly basis to develop his parenting skills so that he could appropriately communicate with KJD, to be sensitive to her needs and feelings, and to learn to understand KJD's need for medication. The father left the DFS office before this plan could be discussed with him. He

later returned but left again when his attorney could not be contacted.

[¶ 16] On November 18, 1999, a dispositional/review hearing was held in the juvenile case. The juvenile court ordered the father to "cooperate with the Department of Family Services and their case plan for reunification, which includes engaging in counseling and paying child support, and the father shall sign the case plan."

[¶ 17] On November 30, 1999, a second meeting was held concerning the October 26th case plan. The goal of this meeting was to secure a permanent living arrangement for KJD. The plan was basically the same as the October plan, but DFS would pay for the father's counseling if he signed a release so that DFS could be informed of his progress. The father refused to sign or comply with this plan.

[¶ 18] DFS found the father uncooperative during its eight years of trying to develop a reunification plan with which he would agree and comply. He also refused to pay child support even when he was repeatedly ordered to pay a minimal monthly amount. The record indicates that, while living in Casper, he was employed with the Great Canadian Log Home Company, and while living in Sheridan, he worked at an auto body shop, yet he refused to pay child support.

[¶ 19] On January 24, 2000, the juvenile court entered an Order for Placement continuing legal custody of KJD with DFS and physical custody with the grandparents. On July 19, 2000, CASA sent a letter to the father notifying him that it would no longer supervise his visits with KJD. The director stated, in part:

It is our responsibility to maintain a safe and secure atmosphere for the children we serve during all visits, which includes their emotional security as well as their physical safety. Over the past year, you have consistently disregarded [KJD's] feelings even

7. It is not clear from the record exactly when the father began acting pro se. He initially had an attorney from April 26, 1993, to October 19, 1993, when this attorney was asked to withdraw as the father wished to be represented by another attorney. There is mention of counsel through

May 1997, and then the father left Wyoming in October 1997 and did not return until July 1998.

8. The record does not indicate what events, if any, occurred from July 1998 until the next case plan meeting in October 1999.

when she stated them openly. You have instigated arguments and continued to approach inappropriate subjects with [KJD] during visits, including talking about legal issues and making negative comments about [ED and LD] ... .... [A]fter the last visit this type of behavior reached a level that is intolerable.... We cannot allow supervised visitation to turn into a time for you to harass, demean and argue with [KJD] to the point she is so upset she cries. Nor can we condone your show of blatant disrespect for our services and other service providers in front of [KJD].

[¶ 20] On February 23, 2000, DFS signed a Consent to Adoption of KJD by her grandparents. The grandparents filed the petition to adopt, which is the subject of this action, on March 21, 2000. A hearing to the district court, without a jury, was held on January 22, 2001, and a Final Decree of Adoption of KJD by the grandparents was entered on February 14, 2001. The father appeals the final decree of adoption.

## STANDARD OF REVIEW

[¶ 21] It is within the power and discretion of a trial court to grant an adoption without parental consent, providing all statutory elements are met. "The power to grant or deny a petition for adoption is within the discretion of the trial court." *In re Adoption of SMR*, 982 P.2d 1246, 1248 (Wyo. 1999). An appellate court will not interfere with a district court's discretionary decision absent a clear abuse of that discretion. *Semler v. Semler*, 924 P.2d 422, 424 (Wyo.1996). " 'In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances.' " *Matter of Adoption of CCT*, 640 P.2d 73, 76 (Wyo.1982) (*quoting Martinez v. State*, 611 P.2d 831, 838 (Wyo.1980)). Assessing whether there has been an abuse of discretion involves determining whether the

evidence is sufficient to support the district court's decision. *Basolo v. Basolo*, 907 P.2d 348, 353 (Wyo.1995). "A finding rendered without sufficient evidence, however, is erroneous and constitutes an abuse of discretion...." *Kennedy v. Kennedy*, 761 P.2d 995, 998 (Wyo.1988) (*citing Miles v. CEC Homes, Inc.*, 753 P.2d 1021, 1022 (Wyo.1988)). The burden is on the appellant to show such abuse. *Blake v. State*, 933 P.2d 474, 477 (Wyo.1997).

## DISCUSSION

[¶ 22] The father's first two allegations can be dealt with relatively quickly. The first concerns his demand for a jury trial in the adoption proceedings. The district court did not commit any error in denying the father's repeated requests for a jury trial because there is no right to a jury trial in adoption proceedings under Chapter 22 of Title 1 of the Wyoming Statutes. Adoption is entirely a statutory procedure and adoptions must be conducted in strict compliance with the governing statute. *In re Adoption of Strauser*, 65 Wyo. 98, 196 P.2d 862, 866 (1948). Wyo. Stat. Ann. §§ 1–22–105 and 1–22–106 (LexisNexis 2001) clearly contemplate that adoptions are to take place in a hearing before the court rather than a trial before a jury.[9] Likewise, Wyo. Stat. Ann. § 1–22–110, the statute under which this particular adoption took place, provides for the court, not a jury, to make the findings necessary for an adoption to take place without consent. As we have long recognized, it is not for this Court to decide what should have been said in a statute. *Barber v. State Highway Commission*, 80 Wyo. 340, 342 P.2d 723, 725 (1959). Had the legislature intended for there to be a right to a jury trial in adoption proceedings, it could have so provided, as it did in the statutes that govern termination of parental rights in non-adoption cases under Wyo. Stat. Ann. § 14–2–312 (LexisNexis 2001).

[¶ 23] The father contends that denial to him of a jury trial in this case is unconstitu-

---

9. Wyo. Stat. Ann. § 1–22–105 provides for confidential, closed hearings in open court or in chambers, specifies those who may be in attendance, and makes no provision for jurors. Wyo. Stat. Ann. § 1–22–106 provides for a show cause hearing in cases where certain parties have not filed a consent to adopt, once again making no provision for a jury trial.

tional. We have previously held that the Seventh Amendment to the United States Constitution was not incorporated into the Fourteenth Amendment and is not applicable to state court proceedings.[10] *Matter of GP,* 679 P.2d 976, 988 (Wyo.1984). We have also determined that it is not unconstitutional to have different statutory standards for terminating parental rights under Title 14 of the Wyoming Statutes and allowing adoption without consent under Title 1 of the Wyoming Statutes, because the two acts do not have the same purpose, despite the fact that an adoption under Title 1 will have the effect of terminating parental rights by operation of law. *Matter of Adoption of RHA,* 702 P.2d 1259, 1264–65 (Wyo.1985).

[¶ 24] The father also relies on W.R.C.P. 38 to support his demand for a jury trial. W.R.C.P. 38(a) states:

Issues of law must be tried by the court, unless referred as hereinafter provided; and issues of fact arising in actions for the *recovery of money only, or specific real or personal property,* shall be tried by a jury unless a jury trial be waived, or a reference be ordered. *All other issues of fact* shall be tried by the court, subject to its power to order any issue to be tried by a jury, or referred.

(Emphasis added.) In the instant case, the hearing obviously was not for the "recovery of money only, or for specific real or personal property," so W.R.C.P. 38 adds nothing to the father's argument.

[¶ 25] We conclude that no constitutional, civil, or statutory rights of the father were violated by the district court's decision to deny him a jury trial.

[¶ 26] The father next asserts that a conflict of interest existed or a Wyoming court rule was violated by the grandparents' attorney serving as counsel for them while also serving the Fourth Judicial District as a

court magistrate. At the hearing, the grandparents' attorney stipulated, first, that he was a magistrate in both the circuit court and the district court. He then corrected himself to say that he was a court commissioner in both courts. While it is not made clear in the record, we will assume that his statements referred to the Fourth Judicial District Court and the Fourth Judicial Circuit Court, both of which cover Sheridan County.

[¶ 27] In support of his argument, the father cited at trial and again in his appellate brief "part C ... 2 and 3" of the Wyoming Code of Judicial Conduct and indicated that the portion of the Code that he was reading "concerns part-time judges and magistrates and such." From his reference, it is clear that he was reading from a section at the end of the Code entitled "Application of the Code of Judicial Conduct." The applicable section reads, in pertinent part:

C. *Continuing Part-time Judge.*—A continuing part-time judge

\* \* \*

(2) except for a court commissioner, shall not practice law in the court on which the judge serves or in any court subject to appellate jurisdiction of the court on which the judge serves [and]

(3) shall not act as a lawyer in a proceeding in which the judge has served as judge or in any other proceeding related thereto.

Code of Judicial Conduct at 893.

[¶ 28] We can automatically discount subsection (3) because there is no allegation anywhere in the record that the grandparents' attorney had served as a judge, magistrate or court commissioner in the instant proceeding or any related to it. We can almost as readily discount subsection (2) be-

---

10. The Seventh Amendment of the United States Constitution reads as follows:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

The Fourteenth Amendment of the United States Constitution reads, in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

cause we find that, whether the grandparents' counsel acted as a court commissioner or a part-time magistrate, the Canon was not violated.

[¶ 29] Under the Code, a continuing part-time judge is "a judge who serves repeatedly on a part-time basis under a continuing appointment, including a retired judge." Code of Judicial Conduct at 871. Section A of the "Application of the Code of Judicial Conduct" makes it clear that this definition applies to "[a]nyone ... who performs judicial functions, including an officer such as a magistrate, court commissioner, special master or referee[.]" Code of Judicial Conduct at 893. Since section C(2) of the "Application of the Code of Judicial Conduct" exempts from its mandates only court commissioners, there is some suggestion that anyone called a magistrate, rather than a court commissioner, must abide by the Canon. Code of Judicial Conduct at 893. This is too narrow a reading of the Code.

[¶ 30] The official commentary to section A of the "Application of the Code of Judicial Conduct" specifies how the Canon is to be applied:

The four (4) categories of judicial service in other than a full-time capacity are necessarily defined in general terms because of the widely varying forms of judicial service.... The determination of which category and, accordingly, which specific Code provisions apply to an individual judicial officer, depend upon the facts of the particular judicial service.

Code of Judicial Conduct at 893. This guidance is consistent with the admonition contained in the Code's preamble that "[t]he Canons and Sections are rules of reason. They should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances." Code of Judicial Conduct at 870.

[¶ 31] We can start the analysis of this issue by noting that there is no such thing in Wyoming as a district court magistrate. District court commissioners, on the other hand, are provided for in Wyo. Stat. Ann. §§ 5–3–301 through 5–3–312 (LexisNexis 2001). In particular, Wyo. Stat. Ann. § 5–3–312 establishes the limits upon a district court commissioner's practice of law:

No district court commissioner shall accept employment or retainer as an attorney-at-law, or give any advice as such in any action, cause or proceeding pending before him as such commissioner; and he shall not be authorized to act as such commissioner, or exercise any of the powers thereof, in any action, case or proceeding in which or as to the subject thereof he shall have been engaged, employed or retained as an attorney, or in reference to which and the subject thereof he shall have given any advice.

[¶ 32] We interpret this statute and the Code of Judicial Conduct as authorizing an attorney who happens to be a district court commissioner to practice law in the court in which he has been appointed, in all cases except those specifically enumerated in the statute.

[¶ 33] On July 1, 2000, the statutes regarding former county courts, Wyo. Stat. Ann. §§ 5–5–101 through 5–5–175 (Lexis 1999) were revised and renumbered as Wyo. Stat. Ann. §§ 5–9–101 through 5–9–153 (LexisNexis 2001), and Article 2, concerning Magistrates of the Circuit Court, was added as Wyo. Stat. Ann. §§ 5–9–201 through 5–9–213 (LexisNexis 2001). Under former Wyo. Stat. Ann. § 5–5–162, judges of the county court could appoint as many commissioners or adjunct commissioners that public interest required. Under the revised statutes, county courts became known as circuit courts and commissioners became known as magistrates.

[¶ 34] The revised statutes recognize two types of magistrates: full-time magistrates and part-time magistrates. There is no suggestion in the record that the appellees' counsel now is or has ever been a full-time magistrate, so we will consider only the part-time magistrate position. In that regard, it is clear from a comparison of the statutes that the function of the part-time circuit court magistrate essentially is the same function once performed by the county court commissioner. While the Code of Judicial Conduct has not been amended to take

cognizance of these statutory changes, we find that the spirit and intent of both the statutes and the Code are best honored by considering a part-time circuit court magistrate to be the equivalent of a court commissioner for the purposes of subsections (2) and (3) of section C of the Code quoted above. As such, part-time magistrates are similarly exempted from the dictates of those subsections.

[¶ 35]  The final contention of the father is that the adoption should be reversed.  His appellate brief contains little cogent argument or authority in regard to this issue, and in fact, it is difficult precisely to determine the nature of the father's complaint.  There is a hint of a sufficiency of the evidence argument, but the father's primary concern seems to be that his "rights" were violated.

[¶ 36]  We have held that the right to associate with one's family is a fundamental liberty interest under the United States Constitution and Wyo. Const. art. 1, §§ 2, 6, 7 and 36.  *Matter of GP*, 679 P.2d at 981; *DS v. Department of Public Assistance and Social Services*, 607 P.2d 911, 918 (Wyo.1980).  We have also made it clear that we revere the family relationship:

> "It may be that in matters such as this, lawyers, judges, parents—all of us—should digress from the ordinary course of things to contemplate how deeply seated the child-parent relationship is in the warp and woof of the American fabric.  In this matter, where the law must decide whether a child will be separated from [her father], we have looked to the Declaration of Independence for guidance."

*Matter of GP*, 679 P.2d at 981 (*quoting DS*, 607 P.2d at 919).

[¶ 37]  We do not take lightly the issue of adopting a child without a parent's consent.  "[A]doption statutes are strictly construed when the proceeding is against a non-consenting parent and every reasonable intendment is made in favor of the parent's claims."  *Matter of Voss' Adoption*, 550 P.2d 481, 485 (Wyo.1976).  Strict construction is mandated by the fact that parental rights are fundamental rights.  *DS*, 607 P.2d at 918.

[¶ 38]  The record reflects that the father had knowledge as early as January 1993 that his daughter was being supported by DFS.  However, he has never substantially contributed to her maintenance.  The record indicates that the father had on occasion given money to his daughter, but the number of times this occurred or the exact amount is not known.  It has been estimated to be approximately $100.00 over the last several years.  The record indicates that the father made no payments to the Clerk of the District Court, Natrona County, regarding child support for KJD. He was requested to do so in his case plan for reunification dated July 16, 1996, with minimal payments of fifty dollars per month to begin on August 1, 1996.

[¶ 39]  At the adoption hearing on January 22, 2001, several people testified that the father had not paid child support.  When the first social worker was asked whether the father had paid support, she responded that he had not, and to her knowledge he had never paid child support.  This social worker also indicated that the father was not in agreement with the case plan because he did not want to pay child support.  KJD's step-grandmother testified that to her knowledge, the father had never paid child support, but that he had given KJD money at different times.  The guardian ad litem testified that at the dispositional/review hearing on November 18, 1999, where the district court ordered the father to pay child support, he basically told the district court that he would not.

[¶ 40]  We note that the father has the ability to earn money and to contribute to the maintenance of KJD. The record indicates that prior to arriving in Wyoming, the father was a self-employed woodcutter for seven years, earning approximately $200.00 to $400.00 per month.  He was employed in Casper as a woodcutter at Great Canadian Log Home Company and he worked for an auto body shop in Sheridan.  However, the father refused to supply DFS with any information as to how much he earned while employed.

[¶ 41]  The father did not cooperate with DFS or comply with its case plans for reunification with his daughter.  He was well

aware that his daughter could be returned to him if he would cooperate and comply with the case plans developed by DFS, yet he willfully chose not to do so.

■ [¶ 42] This Court has defined willfully to mean: " '[I]ntentionally, knowingly, purposely, voluntarily, consciously, deliberately, and without justifiable excuse, as distinguished from carelessly, inadvertently ... or thoughtlessly.' " *Matter of Adoption of G.A.R.,* 810 P.2d 113, 118 (Wyo.1991) (*quoting Matter of Adoption of CCT,* 640 P.2d at 76). The evidence is clear that the father willfully refused to pay child support and allowed KJD to be maintained by the State for over eight years; that he failed to provide a suitable home for KJD; that he failed to provide any information by which the proper amount of child support could be established; that he rejected endorsement of the case plans; and that he failed to raise any legitimate objection to the plans or propose any alternative plan. The father acted contrary to the best interests of KJD, created conflicts during visitations, and threatened DFS and CASA workers.

[¶ 43] For the foregoing reasons, we conclude as did the district court, that the father's actions were willful, and that he willfully permitted KJD to be maintained by DFS. The father offers no justifiable excuse for his failure to contribute to the support of his daughter. The district court did not err in finding this failure to be willful.

## CONCLUSION

[¶ 44] The evidence is sufficient to support the finding that the father willfully failed to contribute to the support of KJD for one year prior to the filing of the petition for adoption, making it unnecessary to obtain his consent to the adoption. The district court did not abuse its discretion in granting the adoption of KJD by her maternal grandparents. The Final Decree of Adoption is affirmed.